### WILLIAM HILLHOUSE *against* LEVI CHESTER.

The maxim *seisina facit stipitem* has never been a-dopted in this state; but on the death of the ancestor, the descent is cast upon the heir, without any reference to the actual seisin of such ancestor.

By the statute of distributions, previous to the revision in 1784, real and personal property were placed upon the same footing; and the term "*next of kin*" had the same meaning, whether used with reference to one or the other. When used with reference to real estate, it never meant those only *of the blood of the first purchaser.*

MOTION for a new trial.

This was an action of ejectment for a valuable real estate in *Montville.*

At the trial, the general issue being pleaded, the <span>June, 1808.</span> jury, pursuant to the direction of the court, found a <span>HILLHOUSE</span> verdict for the defendant.            <span>v.</span>
                                                    <span>CHESTER.</span>

The plaintiff moved for a new trial. The case, as it appeared at the trial, and as stated in the motion, was as follows: The Rev. *James Hillhouse*, being seised of the premises, died in 1740, leaving two sons, of whom the plaintiff is one, and a daughter, *Rachel*. The premises were set off to her, as her share of her father's estate. In 1753 she was married to *Joseph Chester*. They had issue a daughter, *Mary*, in 1754. *Rachel* died soon after the birth of *Mary*. *Mary* died in 1765, without issue, under the age of twelve years. *Joseph Chester*, on his marriage, became seised in right of his wife; and, on the birth of *Mary*, as tenant by the curtesy. In *January*, 1801, he conveyed the premises to the defendant, and died in *August*, 1804. On his death, the defendant entered, and remains in possession. The plaintiff claimed title as heir, and next of kin of the blood of the ancestor from whom the estate came.

*Daggett* and *W. Hillhouse*, for the plaintiff.

1. We contend, that *Mary Chester* was never seised of this estate so that a title can be derived from her. The common law maxim, that *seisina facit stipitem*, which has been recognised by every jurist from the author of *Fleta* to *Blackstone*, is decisive against the defendant's claim. This seisin implies not merely a right to enter, but an *actual entry*. The ancestor must have had a seisin *in deed;* for if he had a seisin in law only, it is not sufficient to transmit his estate to his heir. *Fleta*, *l.* 6. c. 2. s. 2. *Co. Litt.* 11. b. 15. a. *H. H. C. L.* c. 11. 2 *Bl. Com.* 209. But *Mary* was not seised, nor indeed could be; for all the time during her life, the freehold was in her father, *Joseph Chester*, as tenant by

the curtesy. But if the defendant cannot derive a title from *Mary*, he has none. He does not claim to be heir to *Rachel*.

2. But however this point may be decided, we contend, in the next place, that by the statute under which this descent was cast, real estate derived from an ancestor is to descend to those only, who are *of the blood* of that ancestor.

Conveyances and grants of lands, with us, are, and always have been, to the grantee, and to his heirs and assigns, for ever. These terms, which have been immemorially adopted, and sanctioned by the law, designate the extent of the tenure. To his assigns, implies a power of disposition; and, to his heirs, is a guaranty of the property (if not disposed of) to those who stand in the relation of heirs to the purchaser, or patentee. There have been different opinions respecting the origin of these rights; some have considered them merely as of positive institution. " But this opinion," says Judge *Swift*, (*Syst*. vol. 1. 232, 235.) " cannot be well founded; for when a man has acquired an exclusive right to a certain thing, and added to the value of it by his own labour, it is consonant to nature that he should determine who should enjoy the property, which he can enjoy no longer. And in case of his dying without a will, that his estate should descend to his nearest relations." It is a truth, attested by the concurrent feelings of mankind, that every person has a natural right to dispose of the estate he has acquired; and that, on his decease, without manifesting his intentions, it should descend to relatives, in preference to strangers; arising, not merely from the presumption that such would be the wish of the acquirer, but from the mutual obligations of kindred.

June, 1808.

HILLHOUSE
v
CHESTER.

The property in question descended from the Rev. *James Hillhouse*, (the father of the plaintiff,) who was the first purchaser; between whom and *Joseph Chester*, or the defendant, there never was the least affinity of blood whatever. And yet the defendant claims, that this estate came to him, or to *Joseph Chester*, by descent. Strange doctrine of descents! If such, indeed, be the rule, it must be different from any known in the free and established systems of ancient or modern jurisprudence.

The following are extracts from Sir *William Jones's* translation " of the speeches of *Isæus*, concerning the succession to property in *Athens*."

" All genuine, unadopted citizens may devise, provided they have no legitimate children, and be not disabled by lunacy, &c. nor under duress.

" The wills of such as have legitimate sons shall stand good, if such sons die before their age of sixteen years. If a man have legitimate daughters, he may devise, on condition that the devisees take them in marriage. Adopted sons shall not devise the property acquired by adoption; but if they have legitimate sons, they may return to their natural family. If they do not return, the estates shall go to the heirs of those who adopted them.

" No adoption by a man, who has legitimate sons born, shall be valid.

" If a citizen die intestate, and leave daughters, the nearest kinsmen, who marry them, shall inherit; but if he die childless, his brothers by the same father, shall be his heirs. Males, and the children of males, shall be preferred, although in a remoter degree, provided

June, 1808. they belong to the same branch," &c. *H. H. C. L.*

HILLHOUSE
v.
CHESTER.
2. 81. *note.*

In a preceding part of the same note, it is said, that those who married the daughters (under the last of the foregoing clauses) should not have the estate, unless the daughters were living: so that they took the estate merely in right of their wives. They were likewise to be the nearest kinsmen of the intestate. The savings that the brothers should be " by the same father," and that the males who inherited should " belong to the same branch," show, that the blood was regarded, and that the half blood could not inherit, unless they belonged to the same branch; that is, were *of the blood.* Their regard for *the blood* is further evinced by their restricting the power of devising; the object and effect of which was to keep the estate in the blood: and by the provisions that the devisees should marry the daughters of the devisor; and if those who came in by adoption did not return, the estate should go to the heirs of those who adopted them. In a subsequent note, (p. 83.) respecting the *Roman* or civil law, it is observed: " The succession to the estates of intestates, was one of the most uncertain points of the *Roman* law. The distribution which had for some time prevailed, took a different turn, and that even while the emperor was compiling his body of laws; for the system of the novels (the CXVIII. particularly) defeats the doctrine laid down in several of the titles of the third book of the *Institutes,* where the point was considered and meant to be established."

This uncertainty arose, and will always arise, from arbitrary power. After the abolition of the consular, and the introduction of the imperial government, every thing depended on the will, or edict of a despotic and often depraved head. A singular feature in this system was,

that the parents, or either of them, took the estate equally with the brothers and sisters of the deceased. We shall not be surprised at this, but rather that the parents did not take the whole, when we are told, that by the law of the twelve tables, fathers had the power of life and death over their children, and might sell them. As this rule speaks of the succession of both parents, it must refer to property *acquired*, and not coming to the child *by descent.* Another rule in the same code, (as laid down 2 *H. H. C. L.* 87.) providing that where there were no brothers and sisters, *ex utrisque parentibus conjuncti*, nor any of their immediate descendants, the half-blood should succeed, undoubtedly applied to property *purchased* or *acquired;* for the terms *ex utrisque parentibus conjuncti*, imply a reference to, and preference of *blood.* " According to the laws of *Normandy*," says Sir *M. Hale*, (*H. C. L.* c. 11.) " if lands descended from the part of the father, they could never resort, by descent, to the line of the mother. But in case of purchases by the son, who died without issue, for want of heirs of the part of the father, it descended to the heirs of the part of the mother." Respecting the rule, that "*fratres consanguinei, ex eodem patre, sed diversa matre,* shall take by descent, together with the brothers, *ex utroque conjuncti*, upon the death of such brothers," *Hale* says, (p. 94.) " But *quære* hereof, for it seems a mistake. As I take it, the half-blood hinders the descent between brothers and sisters, by their law as well as ours." This rule, undoubtedly, refers to estates by purchase, or by descent where the half-blood was from the common ancestor. In the first case, there would be no great, and in the last, not any, impropriety in the admission of the half-blood.

Indeed, in considering the systems of descent which have heretofore existed, or which now exist, various mistakes and misapprehensions arise from our not dis-

June, 1808.

HILLHOUSE
v
CHESTER.

tinguishing where the rules of inheritance apply to estates acquired by *purchase*, or to those which come by *descent*. By adverting to this distinction, and with the qualifications before referred to, we shall find the rights of the *blood* have been, and are, universally respected.

The principles of inheritance have been adopted by civilized nations, not merely from a regard to private right, but from considerations of public expediency. They are powerful motives to industry; they attach individuals most strongly to society. The patrimony of our ancestors is dear to us, because it was their patrimony. It is the bond of union; it is the beginning of the love of our country; and has been the favourite theme of the poet and the patriot in every age; who have spoken in the most expressive terms of their native soil, because it was the land of their fathers.

Ages before the dawn of *Grecian* literature, or the rise of the *Roman* power, the ALMIGHTY himself established the rights of inheritance. The scripture speaks of the land of *Canaan*, as the patrimony of the children of *Israel*, because it was given to *Abraham* for a possession: although the period of many generations had elapsed after *Jacob* and his sons first sojourned in *Egypt*, to the time when their descendants returned to claim the inheritance of their fathers.

That this was not merely a national claim, but that there were rights which appertained to the individuals of the family to which the inheritance was annexed, is evinced in the case of *Zelophehad's* daughters, recorded in the 27th chapter of *Numbers*, which merits attention, as no cause determined by any human tribunal, can claim an equal solemnity of decision. "Then came" (it is said) "the daughters of *Zelophehad*, and they stood

before *Moses* and before *Eleazer*, and before the princes,
and before all the congregation, saying: "Our father
died in the wilderness in his own sin, nor was he in the
company of *Korah*"—[that is, he was guilty of no act of
rebellion by which he forfeited his birthright] " why
should the name of our father be done away because he
has no son?"

As by the rule excluding the daughters, the name of
the deceased would be done away, the question was im-
portant. " And *Moses* brought their cause before the
LORD. And the LORD spake unto *Moses*, saying: The
daughters of *Zelophehad* speak right; thou shalt cause
the inheritance of their father to pass unto them."

On this, the general and abiding rules of inheritance
are thus given: " If a man die, and have no son, then
ye shall cause his inheritance to pass unto his daughter.
And if he have no daughter, then ye shall give his in-
heritance unto his brethren. And if he have no bre-
thren, then ye shall give his inheritance unto his father's
brethren. And if his father have no brethren, then ye
shall give his inheritance unto his *kinsman, who is next
to him of his family*, and he shall possess it." These
rules do not appear to have been founded on any politi-
cal considerations, but on the rights of the parties, ari-
sing from the ties of kindred, as it was politically in-
different whether the descent was to one individual, or
another, of the same tribe.

A subsequent, which may be considered a national,
ordinance, (as in the 36th chapter,) *restricts* the mar-
riage of an heiress " unto one of the family of the
tribe of her father"—" That the children of *Israel*" (it
is said) " may enjoy every man the inheritance of his
fathers."

The rights of inheritance, then, are not only founded in nature, but (according to the above and other passages of inspiration) have received the sanction of the ALMIGHTY.

The foregoing table is the foundation of the common law rules, and of our different statute rules of descent. By that table, the rule is, that on failure of children, the inheritance shall be given to brethren of the deceased; on failure of these, to his father's brethren; on failure of these, to his kinsman who is next to him of his family. By our statute, as it stood before, and on the revision of 1750, under which the present question arises, the rule is, that the estate shall be distributed to the children, &c. and on failure of these, to the next of kin.

" His *kinsman who is next to him of his family*," and " *next of kin*," are, we conceive, synonymous terms, when applied to the rights of inheritance. This was the opinion of Sir *Edward Coke*, who, in 3 *Rep.* 40., speaking of descents, quotes the case of *Zelophehad's* daughters; where he thus renders in *Latin* the concluding part of the table—" *sin autem nec patruos habuerit;*" and if his father have no brethren, " *dabitur hæreditas his qui ei proximi sunt*"—the inheritance shall be given to those *who are next to him*, or *who are next of kin*. And the injunction, with which the rules of descent are closed, he renders " *erit que hoc filiis Israel sanctum lege perpetua*"—and this shall be sanctioned or sealed to the children of *Israel* by a perpetual law. This law he calls a general law, " which extends" (he says) " not only to the said particular case, but to all other inheritances, to all persons, and at all times."

That the divine law may, in many respects, be considered as a general law, to regulate the civil, as well as the moral conduct of mankind, has been the opinion of

many respectable writers, as well as of *Coke*, that source
and fountain of legal science. When any principle,
contained in that code, does not originate from the pe-
culiar situation and economy of the *Jewish* nation, it
ought, from the authority of the divine lawgiver, to have
a leading influence. As the rule of descent here no-
ticed did not originate from any political considerations,
it must have resulted from natural fitness and pro-
priety.

Although our former statutes, as well as the statute
in question, made use of the term *next of kin*, which is
nearly similar to the term used in the *English* statute;
yet we are not to suppose, that the framers of our sta-
tute were ignorant of the import of the term when ap-
plied to the rights of inheritance. It was probably
adopted because it was in analogy to the divine rule.
This is corroborated by the provision, which allotted a
double portion to the eldest son, in which the two tables
compare; and where the statute rule was confessedly
taken from the scripture. The presumption of this
conformity is further corroborated by the known vene-
ration of our ancestors for the divine code. This ap-
peared in all their legislative and judicial proceedings;
and is acknowledged by an express statute, commonly
called *the Declaration of Rights:* which, in the revision
of 1750, and in all the previous revisions, was the first
statute in the book. By this, it is enacted, " That no
man's goods or estate shall be taken away from him, or
any way endamaged, unless it be by virtue or equity of
some express law; or in case of the defect of such law
in any particular case, by some clear and plain rule war-
ranted by the word of GOD." This is an explicit recog-
nition of the authority of the divine law, which is ac-
knowledged as the law paramount, in all questions of
difficulty or of doubt, arising from the defect of any par-
ticular law.

If from the foregoing reasoning, and from what may hereafter be submitted, the court are of opinion, that the two tables can be reconciled, and that *next of kin*, and his *kinsman who is next to him of his family*, may receive the construction given by *Coke*, and which is here given, the result must be in favour of the plaintiff.

In 6 *Mod.* 143., it is said, " If a statute makes use of a term, it shall receive the same sense that the common law takes it in, and no other," or " it shall be understood in the same sense in which it is understood at common law." It is likewise a rule, that in construing a statute, the subject matter respecting which it is conversant is to be taken into consideration. It becomes, then, important more particularly to inquire the legal import and meaning of *next of kin*, when applied to the rights of inheritance.

*Coke*, in 3 *Rep.* 40., before noticed, considers " his kinsman who is next to him of his family," and *next of kin*, as having the same signification, when applied to the same subject matter.

In *Ruffhead* and *Morgan's* edition of the *New Law Dict.* tit. *Descent*, the rule is thus given: ' He which is next of kin in the collateral line of the whole blood, though never so remote, comes in by descent; for there is next of kin by right of representation, and by right of propinquity or nearness of blood." Referring to Sir *M. Hale's* argument in *Collingwood* v. *Pace*, 1 *Vent.* 415., and to *Radcliffe's* case, 3 *Rep.* 40. Again, from *Bacon's Elements*— ' Lands descend, if there be no brother or sister, to the uncle and his issue; and if there be none such, *then to the cousins in the nearest degree of consanguinity*."

The last rule, where it is said, " *Lands* descend *to*

June, 1808.

HILLHOUSE
v.
CHESTER.

*the cousins in the nearest degree of consanguinity,"* is like the term used in the statute, without any qualification; and yet it has always been construed to mean cousins in the nearest degree of consanguinity of the blood of the ancestor.

*Blackstone*, in detailing the rules of descent, (2 *Com.* 224.) says, " The collateral heir of the person last seised must be his next collateral kinsman of the whole blood."

*Littleton*, 1 *Inst.* 10., is thus: " *Et si home purchase terres en fee-simple, et devy sans issue, cheschun que est prochein cosin collateral, del entire sanke, de quel pluis long degree qu'il soit, poet inheriter et aver meme la terre come heire a luy.*"

" And if a man purchase land in fee-simple, and die without issue, he which is next cousin collateral of the whole blood, how far soever he be from him in degree, may inherit and have the land as heir to him."

Here *Coke* makes the following comment:

" Upon this word *prochein* (next) I put this case. One hath issue two sons *A.* and *B.*, and dieth: *B.* hath issue two sons, *C.* and *D.*, and dieth: *C.*, the eldest son hath issue, and dieth: *A.* purchaseth lands in fee-simple, and dieth without issue. *D.* is the next cousin, and yet shall not inherit, but the issue of *C.*; for he that is inheritable, is accounted in law next of blood. An d therefore, here is understood a division of next viz. next *jure representationis*, and next *jure propinquitatis*; that is, by right of representation, and by right of propinquity. And *Littleton* meaneth of the right of representation; for, legally, in course of descents, he is next of blood inheritable." " And here ariseth a diversity in law

between next of blood inheritable by descent, and next of blood capable by purchase. And, therefore, in the case before mentioned, if a lease for life were made to *A.*, the remainder to his next of blood in fee, in this case, as hath been said, *D.* shall take the remainder, because he is next of blood, and capable by purchase, though he be not legally next to take as heir by descent.

" Next of kin of the whole blood," " cousins in the nearest degree of consanguinity." " next collateral kinsman," " next cousin" and ' next of blood," (as appears from the above,) are indiscriminately used; and have always been understood with the qualification of blood, when applied to the subjects of inheritance. *His kinsman who is next to him of his family*, *next to him* and *next of kin*, are determined by *Coke* to have the same meaning, and to be synonymous terms, when thus applied.

Other precedents might be adduced. Indeed. this is the meaning affixed to those terms by all common law writers on descents. Referring to the rights of inheritance, then, *next of kin* has acquired a technical and appropriate signification; and means, and did at the time of enacting the statute in question, mean, *next of kin*, or *next of blood inheritable*.

" To know what the common law was (we are told) before the making of a statute, is the very lock and key to open the windows of a statute."

" The best construction of a statute is to construe it as near the rule and reason of the common law as may be."

" When the provision of a statute is general, it is subject to the control and order of the common law." 4 *Bac. Abr.* 647.

By knowing what the common law was, and by taking its rule and reason for our guide, we are furnished with the lock and key to open the windows of the statute in question: and shall be enabled to discover why the term *next of kin* has one signification, when applied to the descent of real estates, and another, when applied to the division of chattels. Personal estate is never considered with reference to any but the immediate possessor. The terms *antiquum aut novum* are not applicable to this description of property: and the same rules, both here and in *Great Britain*, prevail respecting it, whether acquired by purchase, or in any other way. It cannot be pleaded, without delivering possession: nor is it a subject of limitation, or remainder. "A man (says *Coke*) cannot be heir to goods or chattels." And according to *Fearne*, 342., even a devise of a term of years to *A.* and his heirs, goes to his executor. A variety of instances too may be put, in which words receive a construction according to the subject matter. To say of *A.* he stole, would be a charge of feloniously taking, if it referred to taking any thing personal: but if to any thing annexed to the freehold, it would be merely a charge of trespass. A gift of lands to *A.* and the heirs of his body, is an estate-tail to the one who is heir. A gift *by deed* to *A.* and the issue of his body, to *A.* and his seed, to *A.* and his children, to *A.* and his offspring, give only an estate for life: but the same terms *in a will* give an estate in fee or in tail. 2 *Bl. Com.* 115.

If a devise is made of lands, and the devisees no otherwise designated than by the term *heirs*, where they must take by purchase, the eldest, or youngest, or all the sons or children will take respectively, according to the tenure by which the land is holden. "I give," in a deed, when applied to chattels, is a gift for ever:

June, 1808.

HILLHOUSE
v.
CHESTER.

but " I give my farm," though in the same instrument, transfers only a life estate.

We shall, therefore, have no controversy with the gentlemen respecting the *English* statute, nor with respect to our statute as far as it relates to personal estate. Nor shall we controvert the authorities which they adduce, the rules and principles of which apply to the same subject. We agree, with regard to any *chattel* interest, *next of kin* means next *jure propinquitatis;* and refers to the last possessor, and him only; but with reference to descents, it means by right of representation and of blood: and is the same, as if the statute had said to the *next of kin,* who, according to the rules of law, and right of blood, is capable of inheriting.

*Coke,* in the passage before quoted, says that *next cousin,* or *next of blood,* (and which he construes the same as *next of kin,*) when applied to estates by purchase, have relation to the propinquity merely: whereas, when applied to estates by descent, they refer to the line or blood, and mean next of blood inheritable. It is hardly possible, that the rule of construction should be conveyed in language more precise and positive; and which, if not wholly disregarded, must end the controversy; as the reason for the distinction will be still more obvious when these terms are applied to the division of chattels, or to the descent of estates of inheritance.

Whether *Joseph Chester,* or the defendant, is to claim, the effect would be the same; as neither have, or ever had, any affinity of blood to the Rev. *James Hillhouse,* the common ancestor, or *Rachael Chester,* the last of the blood actually seised; and their relationship to *Mary Chester* was merely by the blood of *Joseph Chester :* and as he had no inheritable blood, he could take nothing by

it himself; nor would he transmit any inheritable quality to the defendant. The same rule of construction, which would take this estate from the family of the Rev. *James Hillhouse*, would take it from that of *Joseph Chester.* Merely marrying into a family, and having issue, and the death of the inheriting parent, and of such issue, would entitle the person so marrying, and his connections, to the inheritance. This would be a new mode of acquiring estates; inheritances would be unsettled, and made to dance the roundelay from family to family, by figures totally inconsistent with the established rules of descent: the leading doctrine of which is, that estates of inheritance shall descend to those, and to those only, who are of the blood of the first purchaser. This right of transmitting estates to the heirs of the blood, has always been considered as one of the most important privileges of the *English* law. Sir *Matthew Hale* calls this right one of the *capitula legum.*

After the introduction of the feudal system into *England*, there was a constant struggle to establish the rights of inheritance; and to preserve estates in the blood. The lord claimed to bestow the feud without any reference to these rights; and various burdens were imposed on heirs, by way of heriots, fines, reliefs, &c. in consideration of their being admitted. These, says *Hale*, (*H. C. L.* c. 11. *note D.*) were continued even after feuds became hereditary. He adds, "Though grants were construed strictly, yet if not otherwise expressed, collaterals succeeded; because it was conceived merit of blood was part of the consideration."

Though the work of reformation was gradual in *England*, it was finally completed; and the various oppressive tenures were abolished, and changed for the socage tenure by 12 *Car.* II. c. 24. ; "A statute," says *Blackstone*, (2 *Comm.* 77.) "which was a greater acqui-

sition to the civil property of this kingdom than even *Magna Charta* itself."

The partible socage tenure, being that by which we hold, is of great antiquity. This was established among the ancient *Britons:* which they carried with them into *Wales,* as appears (it is said) by the laws of *Hoel Dha,* in the tenth century. The same prevailed among the ancient *Germans.* The *Saxons* and the *Danes* also adopted the principle of partible descents. *H. H. C. L.* c. 11. *note E.*

The author of *Bac. Abr.* (referring to *Somner,* speaking of gavelkind) says, it was " first introduced by the *Roman* clergy, and therefore propagated more extensively in *Kent,* where the christian religion was first propagated."

" Socage tenures, says *Blackstone,* (2 *Com.* c. 6.) was always by much the most free and independent of any. And, therefore, I cannot but assent to Mr. *Somner's* etymology: who derives it from the *Saxon* appellation *soc,* which signifies liberty or privilege; signifying a privileged tenure."

" Taking this to be the meaning of the word, it seems probable that socage tenures were the relics of *Saxon* liberty. This is peculiarly remarkable in the tenure which prevails in *Kent,* called *gavelkind,* a species of socage tenure; the preservation whereof from the innovations of the *Norman* conqueror is a fact universally known." This, agreeably to Mr. *Selden's* opinion, before the *Norman* conquest, was the general custom of the realm; and " the most usual course of descent all over *England.*"

Such was the attachment to this tenure, that fathers

could make no other distribution. " It is not however
certainly known, whether daughters shared with the
sons in the most ancient times." *H. H. C. L.* c. 11.
note *F.*

This tenure, then, is not of feudal, but of *Saxon*
origin, and was coeval with the introduction of the
christian system ; to the rules of which, respecting de-
scents, it bears a strong analogy.

When we consider the antiquity of the hereditary
transmission of lands, and the unremitting struggles by
which it has been maintained, we shall not be surprised
to find it regarded as of the highest importance : and
as the principal object of the laws of real property in
*England :* or that it should be distinguished as one of
the *capitula legum;* and ranked with the sacred right
of trial by jury. Our ancestors emigrated to this coun-
try, impressed with the same sentiments : nor can we
suppose that they would wantonly renounce these rights,
and enact laws which would carry the inheritance from
the blood. For it would make no difference whether
this was done by their own act, or by the overbearing
hand of power.

Their attachment to these rights does not rest on pre-
sumption. They procured them to be expressly pro-
vided for, and guarantied by the charter, the palladium
of their privileges; the *habendum* of which is, " To have
and to hold the same (meaning the lands granted) unto
the said governor and company, and their associates,
their heirs and assigns ; to be holden of us, our heirs,
and successors, as of our Manor of *East Greenwich,* in
*free and common socage.*"

By the charter there was a concession on the part of
the crown, that the patentees should, and by its accept-

ance, an agreement on their part, that they and those who held under them, would hold according to the tenure of free and common socage. They could convey by deed, or devise; otherwise, the estate must descend to those coming within the meaning of the term heirs, according to the rules applicable to that tenure, which required that they should be of the blood. On failure of these, the estate would escheat. The crown undoubtedly might claim that the terms of the grant should be pursued. We have shown, that the socage tenure was partible in its nature, and whether so or not, in practice, would not effect the rights of the crown. But that the charter might have been extended by the grantees so as to admit another description of persons not within the terms of the grant to inherit, in exclusion of those who were entitled, (for such would be the effect of their construction,) could not, we conceive, be maintained, as the charter is paramount to any statute. Although we are not (since our independence) liable to a forfeiture, still it must have its full operation, and cannot be altered: and a statute as relative to it, must receive the same construction as it would at any time have received. Besides, the charter contains an express guaranty to the heirs of the right of succession.

About 1730, there was an information exhibited to the king and counsel against the colony, by Mr. *Winthrop*, complaining, that the intestate law was contrary to charter, as it contradicted the rule of primogeniture, or unity of descent. Upon which the king and council passed an order vacating the statute; and a committee was appointed by the house of lords, who reported, among other things, that an act of parliament should be made, requiring that all the laws of the colony should be sent to the king and council for approbation. This occasioned a very serious alarm here; and it was thought prudent, under these circumstances, to consider the intestate law as vacated.

But it was recommended to the courts to continue the practice of dividing lands and real estates in common to all the children and heirs, which was done. The assembly also sent a representation to *England*, virtually claiming their right to adopt the partible socage tenure, and stating the necessity and advantages of having lands and real estates descend in common to the children, and the injury that must have arisen to the settlement and improvement of the colony, by restricting the descent to one child, or heir. Mr. *Winthrop* having settled the matter with his sister, (Mrs. *Lechmore*,) the business was never pursued any farther in *England;* and on the next revision of the laws, the statute in question was enacted.(*a*) The above accounts for the very particular manner in which the distributing clause of this statute is introduced. That real estates were taken entirely from the blood by the statute, formed no part of the above complaint. Had that been one ground, it could not have been answered: and as this formed no part of the charge, we may certainly conclude, that no such construction or practice had ever prevailed.

In addition to the provisions of the charter, the act entitled " An act about the tenure of lands" provides, " That whatsoever lands have been, or shall be granted to the respective townships, or to any particular person or persons, shall be held to them, their heirs, successors, and assigns, for ever, according to the most free tenure of *East Greenwich*, according to our charter."(*b*)

A subsequent statute (the preamble of which is, that townships' grants of lands may be settled upon them, their heirs, successors, and assigns for ever) directs,

(*a*) This is not strictly correct. See *Stat. Conn.* p. 267. note (13), edit. 1808. R.

(*b*) *Stat. Conn.* tit. 97. c. 1. s. 1.

VOL. III.  B b

" that they shall take patents for holding such tracts of lands, to them, their heirs, successors and assigns, firm and sure, according to the tenure of our charter, in free and common socage; which patents shall be sufficient evidence for holding the said lands firm to them, their heirs, &c. for ever."(a)  The first of these statutes was passed *October*, 1672, and the last, *October*, 1685, and have ever since continued in force.

They contain three distinct recognitions of the charter, as the foundation of title ; and four positive provisions, that all grants of lands shall be to the grantees, or patentees, their heirs, successors, and assigns, for ever.  It must be conceded, that the rights thus secured will enure to the respective heirs of succeeding grantees.  This must arise from the very terms of the grant " to their heirs, successors, and assigns, for ever;" from analogous rules applied to the statute *de donis;* and from the circumstance that these statutes were from time to time re-enacted.  Our forms of conveyance too, have immemorially been to the grantees, and to their heirs and assigns for ever.  These forms are recognised in the revision of 1750, by " An act concerning the town clerk's office," which provides, that a grant, when recorded in a particular manner, shall be evidence for holding the premises " to the grantee, his heirs and assigns, for ever."(b)

It becomes, then, material to inquire what is meant by the term *heirs;* to whom the inheritance is thus repeatedly guarantied.  " An heir is he to whom lands, &c. by act of GOD, and right of blood, do descend of some estate of inheritance; *nam Deus hæredem facere potest, non homo.*"  1 *Inst.* 7.

(a) *Stat. Conn.* tit. 97. c. 1. s. 3.      (b) *Stat. Conn.* tit. 162. c. 1. s. 4.

June, 1808.

HILLHOUSE
v.
CHESTER.

" Heir and ancestor, *hæres et antecessor*, are always applied to natural persons, predecessor and successor to bodies politic." 1 *Inst.* 78.

" A man, by common law, cannot be heir to goods and chattels; for *hæres dicitur ab hæreditate*." 1 *Inst.* 8. " *Vel dicitur ab hærendo, quia hæreditas sibi hæret.* 1 *Inst.* 7.

" The word *heir* implies that the party hath all those legal qualifications which our laws require." 3 *New Abr.* 17. The author of which [Tit. *Descent, C. note* a.] observes—" In a long course of time, it being impossible to compute to the first marriage, they therefore computed from the last possessor, provided the heir that claimed was of the blood of the first purchaser."

" And note, (says Ld. *Coke*,) it is an old and true maxim in the law, that none shall inherit any lands as heir, but only the blood of the first purchaser, for *re— à quo fiat perquisitum*." 1 *Inst.* 12.

The term *heir*, or *heirs*, then, is an appropriate term, and those who claim as such, must stand in relation of heirs, in right of representation, and of blood; particularly, they must be of the blood of the first purchaser. The charter provides, and successive statutes enact, that lands shall descend to those who stand in this relation. It is, however, contended, that they descend to a motley description of persons, who, not being of the blood, possess none of the requisite qualities; and whose characteristics are abhorrent to hereditary succession.

Although we have not adopted the statute of the 2 *West.* 13 *Edw.* 1. c. 1. called the statute *de donis*, yet the same inquiry will arise in our action of ejectment, as would arise under the writ of formedon, given by that

HARVARD LAW SCHOOL LIBRARY

June, 1808. statute. If the plaintiff can show, that he is entitled

HILLHOUSE *secundum formam doni,* or by the terms of the original
v.
CHESTER. grant or charter, he must recover; especially as that,
or the descent to heirs, is recognised and sanctioned by
repeated statutes.

"If divers statutes (it is said) relate to the same thing,
they all ought to be taken into consideration in constru-
ing any one of them." 4 *Rep.* 4. 2 Ld. *Raym.* 1028.

In *The Earl of Aylesbury* v. *Patterson, Doug.* 30.
Lord *Mansfield* says—"All acts *in pari materia* are to be
taken together, as if they were but one law." The
charter, then, these different statutes, and the statute of
distributions, must be taken together.

Were the latter capable of receiving the construc-
tion for which the defendant's counsel contend, it must
be controlled by the former, which uniformly declare,
that lands shall descend to the heirs. But we have
shown, that *next of kin,* when applied to descents,
means, and has always meant, next of kin *of the blood,*
or next of kin *inheritable:* consequently, this, when
thus applied, and the term *heirs,* are of the same im-
port. The charter, and these various statutes, are a con-
clusive confirmation of our construction. By this all
differences will be reconciled, and the established rules
of inheritance preserved.

The claim of *Joseph Chester* to be heir to *Mary
Chester* would contradict another rule of descent, that
estates of inheritance cannot lineally ascend. Aside
from gravitation, and from feudal policy, there existed
at common law, and under our statutes, substantial rea-
sons for this rule respecting estates by descent.

The estate which came to the child by descent, could

not, in the ordinary course, come from the parent who <span></span> June, 1808.

survived; but it must come from the parent, or stock of HILLHOUSE
the parent who died during the life of the child. To v.
allow the surviving parent to be heir to the child, in CHESTER.
that case, would be to carry such estate from the blood.
It is but passing it to the parent, and it is immediately
in the hands of strangers.

Another reason arises from the situation of the parent,
as natural guardian of the child: as no person who may
be heir to an infant shall be his guardian in socage.
For the law judges it improper to trust the infant in
his hands, who may by possibility become his heir.

*Purchase* and *descent* are the only modes of acquiring
estates recognised by law.

Purchase, taken in its most extensive sense, is thus
defined by *Lyttleton:* the possession of land, &c. which
a man hath by his own act or agreement; contradistin-
guished from acquisition by right of blood, and includes
every other mode of coming to an estate. *2 Bl. Com.*
241.

Descent, or hereditary succession, is the title whereby
a man on the death of his ancestor acquires his estate
by right of representation, as his heir at law. *2 Bl. Com.*
201.

We would ask, under which the defendant claims: is it
by right of representation as heir of the blood?

We have before seen, that he who claims land by
descent, must be of the blood, and that it will escheat
before it can go to one who is not of the blood of the
first purchaser.

Descent implies a progressive continuance in the line, or channel in which the thing spoken of has heretofore moved: and the term inheritance is never used but with reference to the line or blood of the first purchaser. Indeed, it would be a solecism in language, a contradiction in terms, and opposed to every principle of law respecting descents, to say that an inheritance can descend from *A.* to *B.* directly, or by any indirect course; when *B.* is a total stranger to the blood and family of *A.* The defendant's title then cannot be by descent, and no one will pretend that it is by purchase.

Nor can the descent, or distribution of real estates, be governed by the construction which is given to the *English* statute, which respects merely the distribution of personal estate, unless the ability and legal capacity to hold the two descriptions of estate are altered.

Aliens are capable of receiving and holding personal estate; but are totally incapable of holding lands, either by purchase or descent. As it respects personal estate, or letters of administration, an alien may be next of kin: but as it respects estates of inheritance, he cannot be next of kin: that is, although he is next of kin *jure propinquitatis,* and actually takes the personal estate, yet as it respects real estate, his want of legal capacity prevents his being next of kin to take by descent. This shows that next of kin must be understood with reference to the subject to which it applies: and that it has a different signification when applied to real, from what is has when applied to personal estate. Or, as *Coke* very aptly expresses it, *next of kin, when applied to descents, means next of kin inheritable.* It will be no answer to our argument to say, that the present statute will in future prevent the consequences here stated as the result of their construction. The same construction must be given to the

statute under which the present question arises, as
though no subsequent statute had been made.

But it is said, that difficulties would arise in the set-
tlement of estates, if under this statute a different di-
rection may be given to the real, from what is given to
the personal estate. There could, however, be no
greater difficulty in that case, than under the present
statute; where different directions may, and in many
cases must, be given. Besides, it is a general princi-
ple of law, and which holds in every department of
science, that the most worthy shall govern: according
to the maxim, *omne majus dignum trahit ad se minus
dignum.* If then the terms used in the statute import
a different description of persons when applied to real,
from what they import when applied to personal estate,
and the estates cannot be separated, and but one con-
struction must be given, the signification of the term
or terms, as applied to the real estate, must govern, as
that is the most worthy.

It is claimed, that by adopting the terms of the *En-
glish* statute, we adopted their construction.

This cannot be inferred from the adjudications of our
courts, from the time when our statute was enacted:
nor from its provisions. The *English* courts have ad-
judged, that where *A.* dies leaving personal estate, and
one brother *B.*, and three nephews of *C.*, another brother
who is dead, that *B.* and the nephews take *per stirpes:*
if *B.* is also dead, leaving one child, that the child of *B.*
and children of *C.*, take *per capita.* Our courts have
adjudged, that in both cases they take *per stirpes.* In
the first case, the *English* courts exclude the uncles
from, and in the last admit them to, a share with the
brother's children. On these different constructions of
the *English* courts, Judge *Swift* (2 *Syst.* 288.) says, "I

know not by what principle of common sense, or rule
of logic, it can be said, that children do not represent
their parents, unless some of their uncles are alive;" and
asks if it is not equally right to exclude the uncles of
the intestate, in one case as the other.   Under the *En-
glish* statute of the 22d and 23d *Car.* II. c. 10. (which is
their statute of distributions,) the father and mother
took the whole estate in exclusion of the brothers and
sisters.   This gave rise to the statute, 1 *Jac.* II. c. 7.
which provides, that the mother should come in for a
share with the brothers and sisters: on which it is ob-
served, [2 *Bac. Abr.* 428.] " the reason for making this
act, it is said, was because the mother might carry all
away to another husband: but the husband surviving is
entitled to the whole personal estate."

The grandmother is preferred, and the great-grand-
mother has been preferred, in the administration, to the
uncles and aunts.

The warmest advocates for conformity, will not con-
tend that these principles have ever been admitted un-
der any of our statutes, even respecting the division of
personal, much less respecting the descent of real
estates.

It was for a long time much controverted in the *En-
glish* courts, whether even the descent of chattels should
be governed by the canon law, or by the rules of the
common law.   And according to 2 *Lev.* 173. as late as
*Trin. T.* 29 *Car.* II. " It was said at the bar, that the
ecclesiastical court gave half shares to the half blood,
which *Rainsford* and *Wild* held reasonable."

The construction given to the *English* statute by their
courts, has, from time to time, varied: nor could it be
said, that it had any fixed construction at the time our

first statute of distributions was enacted : the difference
in the time of the two statutes being only about twenty
years. As to any established construction, therefore,
the statutes must be regarded as contemporaneous;
especially, considering the distance and the means of
information respecting any adjudications, or principles
of exposition, which were there adopted.

Nor will the provisions of the statutes compare.

The *English* statute directed their prerogative courts,
after expense, &c. paid, to make an equal and just dis-
tribution among the wife and children, &c. " or other-
wise to the next kindred of the dead person, in equal
degree, or legally representing their stocks, *pro suo
cuique jure;* and to compel such administrators to ob-
serve and pay the same, *by the due course of his ma-
jesty's ecclesiastical laws.*" Our statute provided, on
failure of children, that a part of the estate should be
allotted to the wife. " The residue, both of the real and
personal estate, equally to every of the next of kin of the
intestate, in equal degree, and those who legally re-
present them."

We will not remark on the words of the *English* sta-
tute " to the next kindred of the dead person, in equal
degree, or legally representing their stocks, *pro suo
cuique jure;*" or notice their difference, when compared
to the terms of our statute; but merely observe, that all
is there to be decreed, settled and done " by the due
course of his majesty's *ecclesiastical* laws."

At the time of enacting the statute, our ancestors had
not the most favourable opinion of " *his majesty's ec-
clesiastical laws ;*" as the very recollection of them was
accompanied with the ideas of tithes, test acts, Bishop
*Laud,* and the inquisition. This accounts for their total

June, 1808.

HILLHOUSE
v.
CHESTER.

silence in that respect; and shows, that they did not mean to extend the rules of that code to the distribution or descent of real estates; leaving them to operate on things within their peculiar province, as causes matrimonial and testamentary.

The necessary conclusion is, that estates of inheritance were to be regulated and distributed, under the provisions of the statute, by *the good old rules and principles of the common law.*

There had been, at an early period, some attempts to give the term *next of kin*, with reference to estates of inheritance, the construction now claimed, in exclusion of the blood. The Hon. *Thomas Fitch*, afterwards Governor *Fitch*, who in his day had no superior, professionally or judicially, as a lawyer, or as a judge, was appointed to prepare the revision of the statutes, in 1750. He was opposed to any deviation from the good old rules of descent. Although he supposed the then law or custom, as it is called, sufficiently explicit; yet, to put it out of doubt, and to prevent any misconstruction here, or misapprehension in *England*, he inserted the introductory clause of the statute in question, by which it is expressly declared, that lands and real estate, had "by immemorial custom and common consent, descended to and among the children or next of kin of such intestate, *as heirs.*"

Judge *Reeve*, in his "*Essay on the Import of the Term Heirs*," (p. 10.) says, that "where the heir takes in character of heir, he must take in quality of heir," and this will hold *è converso.* This, then, is the same as if it had said, that lands, &c. had descended to the next of kin, who stood in the relation of heirs ; or that they had descended to the heirs *vi termini* next of kin; construing next of kin to mean next of kin inheritable. This

is fully confirmed by what follows: where it will be
noticed with what solicitude the clause is guarded.

It not only says that " real estates have descended to
and among the children, or next of kin of such intes-
tate as heirs," but that the " same have been divided to
and among *such heirs;*" and again, " that the estates,
both real personal, of persons dying intestate, have
ever since the first settlement of this colony, been
divided among, and settled upon, *the heirs of such in-
testates.*"

It was not enough to say, that lands and real estate
had descended to the next of kin, as heirs, and that the
same had been divided among *such heirs,* but it ex-
pressly declares, that they had, from the first settle-
ment of the colony, been divided among, and settled
upon, *the heirs.* Which last, if the others could be
doubted, is sufficient to show, that the term is used in
its technical and appropriate sense. And it is a fact,
that lands and real estate, from the first settlement of
the colony, uniformly descended to *the heirs,* or to those
*of the blood;* till the *Buckingham* case, which will be
noticed.

That the rules of the common law prevailed, par-
ticularly respecting the descent of real estates, is further
evinced by the expression, "by two different courts,
proceeding in different methods, and by different rules."
Here are two courts proceeding not only in different
methods, but by different rules. By rules distinguished
from the methods, or forms of proceeding, must be
meant, that in some cases they were governed by the
rules peculiar to prerogative courts, while in others they
were regulated by the rules of the common law. And
here the common law rules must have referred to the
descent of real estates, as the distribution of chattels,

June, 1808.   was always within the peculiar province of the preroga-

HILLHOUSE   tive court.
v.
CHESTER.

Nor is the statute in question sufficient to vest a fee in the next of kin, unless they claim as heirs of the blood, as there are no words of limitation. The words of the statute are—" And in case there be no children, nor any legal representatives of them, one moiety of the personal estate shall be allotted to the wife of the intestate for ever; and *one third of the real estate for term of life:* the residue, both of the real and personal estate, equally to every of the next of kin of the intestate, in equal degree, and those who legally represent them."

It is not said what estate the next of kin are to take, unless it is governed by the preceding limitation to the widow. One third of the real estate is allotted to the widow for term of life, and then immediately follows " and the residue to the next of kin:" which, according to the rules of construction, would mean in the same way. In that case, it would be only an estate for life in the next of kin: or in the case before the court in *Joseph Chester.*

The truth is, this statute was never designed to alter the established rights of inheritance; but merely to provide a method in which estates were to be divided or distributed. The statute, says *Holt,* (*Rep.* 252.) " is but a direction how he" (the administrator) " shall administer." And such was the uniform construction which the statute received, till the decision of the *Buckingham* case, in 1764; which we beg leave to notice.

Mr. *Buckingham,* by deed or will, gave a valuable real property, lying in *Hartford,* to his mother, who gave it to the *South Society.* The deed or will to the

mother was, for some informality, set aside. Mr. *Sey-*
*mour*, who was counsel for the society, then determined
to claim the property, on the ground, that the mother
was next of kin to her son, (who died without issue,)
in opposition to the collateral kindred of the blood.
Although the idea was treated as chimerical by the pro-
fession generally, he moved the court of probate, in
1761, for distribution, which was made by respectable
freeholders, and accepted by the court, in favour of the
collateral heirs of the blood. This was, in 1762, af-
firmed by the superior court; as no doubt was then en-
tertained respecting the law, or rules of descent.

On this affirmance, a writ of error, by petition, was
brought to the general assembly, where an opportunity
presented of putting in requisition all that extraneous in-
fluence, which has been too frequently practised to ob-
tain what could not be otherwise obtained. In addition
to the deed or will in favour of the mother, there was a
pretence (it is said) that the property originally belonged
to the family of the mother, and circumstances of abuse
from the claimants towards her, were stated: all calcu-
lated to make improper impressions in a question merely
of legal right. By adhering to the long established
course of former decisions, an important fund, or founda-
tion for a fund, was to be taken from a society in *Hart-*
*ford*, where the question was agitated, and the *focus* of
action, and from a society, too, which was considered
as a main pillar of the prevailing system.

The governor and council, however, founding them-
selves on principle and precedent, withstood these com-
bined incidents; nor was it till after repeated applica-
tions, from *September*, 1762, to *May*, 1764, and after
considerable changes in the council, that the decree of
the superior court was reversed.

A decision, under these circumstances, cannot be considered as a precedent; especially when it is recollected, that such tribunals as unite legislative and judicial powers, too frequently blend them in practice; and decide questions of legal right from the particular circumstances of the case, and not from the strictest regard to principle.

It may perhaps be said, that there have been correspondent decisions of the superior court. The superior court were, in 1764, composed of members of the council, and, to be consistent, would undoubtedly adhere to the rule then adopted; nor could we expect a different result, till the influence by which that decision was produced had subsided; and some have been on the bench of the superior court, within a few years, who were in the court, and in the council, in 1764.

We by no means admit, that that, or any analogous decision, was ever acquiesced in as law. It can be said with truth, that the innovating spirit of 1764 was viewed, by the respectable part of the profession, and by reflecting men generally, who traced its consequences, with disapprobation, as not founded in justice or in law.

This appeared in the case of *Hull* v. *Hanford*, decided by the superior court, soon after *Buckingham* v. *Treat*, in favour of the parent, in exclusion of the blood. This was brought by error to the general assembly; and the house of representatives reversed the decree of the superior court, on the principle, that *next of kin* meant *next of kin of the blood;* according to the common law acceptation of the term. The council, however, consisting of the members of the superior court, and of those who had been in the former vote, refused to concur in the reversal. This, however, showed the sense

4

June, 1808.

HILLHOUSE
v.
CHESTER.

of the house of representatives, and the public impression; and evinced no very great respect for what might be called *an ecclesiastical postulatum.*

The same question was again agitated in parson *Ross's* case—whose wife claimed as heir to her child, by a former husband, opposed to the blood. This came by appeal to the superior court. Mr. *Ross,* who was a shrewd man respecting property, dared not risk the trial of it there, or before the general assembly. After lying several years in the superior court, the cause was compromised by dividing the property.(*a*)

Indeed, the doctrine thus attempted to be established, maintained a constant warfare from its rise to its exit; which happened in 1784, on the first revision of the laws, after the *Buckingham* case was decided. By this, the general assembly showed their disapprobation of the principle of that decision; corrected as far as possible the mischief; and fixed not only what the law should be, but, as we say, what it had been.

A cursory view of some leading facts will discover how far the defendant's claim can be warranted on the ground of established practice and precedent.

The only attempt which we find to wrest the statute, as now claimed, till the *Buckingham* case, was in *Pettibone* v. *Buell;* which, as will be noticed, was decided in favour of the blood on an antecedent point, not applying to this part of our argument. This was in 1712. The court are there requested by the counsel for the heirs of the blood in their plea, " to remember the case of *John Blackledge,* jun." as in their favour.

(*a*) These cases were stated from MS. notes of the Hon. *Jonathan Sturges.*

June, 1808.

HILLHOUSE
v.
CHESTER.

In 1727, an explanatory act was passed, in which a distinction is made in the construction of the term *next of kin*, as applied to *real* or to *personal estate;* establishing, it is contended, that which we claim.

Statutes from time to time were enacted, and re-enacted, which expressly provide, that the tenure of lands should be to the grantees, and to their heirs for ever: agreeable to which, and to the charter, were the forms of conveyance then adopted.

In a preamble to the clause of the very statute in question, it is declared, that from the first settlement of the colony, lands, &c. had descended to the heirs.

In the *Buckingham* case distribution is made, and accepted by the court of probate, and affirmed by the superior court, in favour of the blood: and although the governor and council were importuned into a compliance, yet their perseverance in the right evinced that they considered themselves as justified by former practice and precedent.

The surprise and alarm occasioned by that decision, showed, that it was regarded as involving a new and unheard of principle.

Such, then, was the law previous to any statute, and such was the construction of the statutes from the time the first was enacted, till 1764.

" Great regard (says the author of *New Abr.*) ought, in construing a statute, to be paid to the construction which the sages of the law who lived about the time, or soon after it was made, put upon it; because they were best able to judge of the intention of the makers:" referring to 2 *Inst.* 11. 136—181.

To apprehend the force of the above rule, as applicable to this case, we need only consider that here had been a practice under the law, and a construction of the statute by the very sages who probably enacted it, for a period of about one hundred years. And what is there to oppose to this in point of precedent? A mushroom adjudication, nursed in the hot-bed of religious party zeal, with some spurious emanations, which maintained a doubtful existence, from *May*, 1764, when the *Buckingham* case was decided, to *January*, 1784, when the next revision of the statutes was completed; a period short of twenty years. Can this be placed in competition with a construction and practice thus immemorially adopted, and sanctioned, in conformity to the precepts of the law, the provisions of the charter, and of different statutes?

An unequivocal confirmation too of our construction, we claim, is to be derived from the terms of the statute, as revised in 1784; and which is the same as the present statute; founded on these considerations:

1. If it is now just, that those of the blood should have the inheritance of their ancestors in preference to strangers, it was just previous to 1784, and was always so.

2. It is not to be presumed that such important rights should not be fixed, or that the legislature meant to make different tables of descent; and to give the inheritance to those of the blood at one time, and to strangers at another.

3. The present statute gives the true meaning of the term next of kin, by adding *of the blood;* and which was implied in the former statute, according to the

VOL. III.                    D d

common law acceptation of the term, when applied to descents.

4. Had a new law been intended, it would undoubtedly have been so made; whereas, the act of 1784 was brought forward by the committee (who were appointed to revise) merely as a revision, and as such adopted: and the only difference is, that some parts were then given in detail, which were before expressed in general terms.

An inference in favour of our reasoning may be drawn from the character of the committee, the Hon. *Roger Sherman*, equally distinguished for ability, integrity and prudence, and the Hon. *Richard Law*, possessing alike the public confidence.

Under a power to revise, such men would not make important innovations, nor would a new system of descents be framed.

They considered the statute then enacted as a revision, and as such it was adopted; and in the act confirming this revision, a clause is inserted, it would seem, with a view of guarding against the suggestions now urged.

" Provided (are the words of the clause) that such of the foregoing laws as remain in substance the same as before the revisal, shall be considered as having continued in force from the time they were first enacted; any circumstantial amendments or alterations notwithstanding."

Declaratory and explanatory acts are not uncommon in the statute books; and our courts have respected these, while in force, as part and parcel of the original

acts to which they refer; even in cases which had arisen between the precedent and subsequent acts.

*Holt*, Ch. J. thus expresses the rule; [Ld. *Raym.* 1028.] " A subsequent statute may be comprehended within the meaning of an act precedent, (as the statute of 32 *Hen.* VIII. of wills, within the 27 *Hen.* VIII. of jointures,) when the latter statute is within the same reason as the former: 29 *Car.* II. c. 3. p. 35. respecting the right of the husband to take administration on the estate of his wife, is included in 22 and 23 *Car.* II. c. 10.

We would ask, are not all the statutes of distribution within the same reason? Had the general assembly, in 1784, expressly declared, that next of kin meant, and had always meant, of *the blood*, according to the common law rules of descent, the court would have considered themselves bound to give the term that construction; even where the inquiry was respecting its import anterior to that time.

*Goddard* and *Gurley*, for the defendant.

The plaintiff moves for a new trial for a misdirection on two points: first, that *Mary Chester* was so seised as to be capable of transmitting the estate to her heir; and, secondly, that by virtue of the statute then in force, *Joseph Chester*, on her death, became entitled to the estate, as her heir.

1. We contend, that according to the *English law*, a title to the estate could be derived from *Mary*. Wherever an actual entry cannot be made by the person entitled, there may be a *constructive* seisin. Thus, as to remainders and reversions, where an actual entry by the person entitled is impracticable, if he exercises an act of ownership over the estate, this will be deemed

June, 1808. equivalent to an actual seisin of an estate capable of
——— being reduced into possession by entry, and will make
HILLHOUSE the person exercising it a new stock of inheritance.
v. Where lands are held under a lease for years, and the
CHESTER. lessee has entered under his lease, the heir will be con-
sidered as having seisin without entry, and even before
receipt of rent; because the possession of the lessee
for years is his possession. Where lands are let on
leases for lives, the freehold being in the lessees, the
heir has no immediate right of entry on the death of his
ancestor, but is only entitled to the rent reserved in the
lease; by receipt of which, he becomes seised of the
rent, and of the reversion expectant on the determina-
tion of the lease. The entry of the heir upon *any
part* of the estate is constructively a seisin of all the
lands lying in the same county. If the heir be deterred
from entering through fear of bodily injury, he may
make claim as *near* to the estate as he can, and this
will give him seisin for a year and a day. The seisin
of one joint-tenant, coparcener, or tenant in common,
enures to all. But to come nearer to this case, the pos-
session of a guardian in socage, is the possession of the
ward; and the latter thereby acquires seisin without
entry. In *Goodtitle* v. *Newman,* 3 *Wils.* 516., it was de-
cided, that where a posthumous son is born, and the
mother is in possession of the lands, of which his father
died seised, she becomes his guardian in socage; and
the infant son will be thereby deemed to be actually
seised of the inheritance, so as to exclude the half blood.
In a later case, where a person died, leaving two daugh-
ters by different venters; the mother entered as guar-
dian in socage, and received the profits; it was held,
that this gave such a seisin to the daughters, that, on
the death of one of them, the other could not inherit
from her. Lord *Kenyon* said, nothing can be clearer,
than that *an infant may consider whoever enters on his
estate, as entering for his use. Doe* v. *Keen,* 7 *Term*

June, 1808.

HILLHOUSE
v.
CHESTER.

*Rep.* 386. This decision was made in view of all the learning on the subject.

Admitting, however, for the sake of argument, that by the rules of the *English* law, a title to this estate cannot be derived from *Mary*, yet we contend, that by the law of *Connecticut*, the title was so far vested in her, as to be transmissible to her heir. In this state, the father is tenant by the curtesy only until the child comes of age. The rents and profits of the estate are given to the former during that period, for the nurture, education, and support of the latter.(*a*) When the reason ceases, the estate determines. A tenant by the curtesy, therefore, has only a *term for years.* But the word *seisin* is applicable only to an estate of *freehold.* On the death of the ancestor, the heir is seised of the freehold, and the tenant by the curtesy, after entry, is *possessed* of a term for years. This distinction between the *seisin* of the freehold, and the *possession* of the tenant for years, has been established from the time of *Braxton,* who says: " *Item dare potest quis terram quam alius tenet ad terminum annorum, salvo tamen firmario, termino suo, quia istæ duæ possessiones sese compatiuntur in unare, quod unus habeat liberum tenementum, et alius terminum.*" It follows, then, even upon *English* principles, that where the tenant by the curtesy has but a term for years, his estate does not interfere with a seisin of the freehold in the heir. But whether *Mary* was seised or not, she had an interest in the property in dispute; and this interest, whatever it might be, descended to her heir. Our statute determines the mode in which *all the property* of a deceased person shall be disposed of. The terms are such as comprehend all estates to which the intestate had the right of possession, as well as the right, and actual possession. The wife is

(*a*) In support of this position, a note of one of Judge *Reeve's* Lectures upon " *Estates*" was read by the counsel.

to have her dower " in one third part of the real estate of her deceased husband, which he stood possessed of, in his own right, at the time of his decease."(a) An inventory is to be made " of all the estate of the person deceased, as well moveable as not moveable, whatever."(b) " A just division or distribution" is to be made " *of all the estate, both real and personal, of any such intestate*."(c) After provision has been made for the wife, " *all the residue and remainder of the real and personal estate*" is to be distributed to those standing in the relations specified.(d) Where there is a deficiency of personal estate to pay debts, the court of probate is authorized " to order the sale of so much of the real estate as shall be sufficient to pay the same."(e) Now, suppose *Mary* had married and had children, and died during her father's life. Must not her estate or interest in these lands be inventoried? Might not the court of probate order it to be sold for the payment of debts?

A tenant by the curtesy, to say the least, has not a greater estate than a dowress has. Suppose *A.* dies seised of lands, which are assigned to his widow in dower. During her life, *B.* a son and heir of *A.* dies, insolvent. Is not the interest of *B.* in these lands to be inventoried, and made subject to the order of the court of probate.

The truth is, that by our law there is no difference between actual and legal seisin. He who has the right of possession, has, in contemplation of law, the possession.

If it be true, that *Mary* was so seised as to be capable of transmitting the estate, she is to be considered as the

(a) *Stat. Con.* tit. 51. c. 1. s. 1.          (b) *Id.* tit. 60. c. 1. s. 1.
(c) *Id.* s. 12.          (d) *Id.*          (e) *Id.* s. 22.

*proposita;* and from her the title, by inheritance, must be derived.

2. The question then is, secondly, whether, by the statute then in force, the estate, on the death of *Mary*, vested in *William Hillhouse*, the maternal uncle, or *Joseph Chester*, the father. The words of the statute are " the residue, both of the real and personal estate [shall be distributed] equally, to every of the *next of kin* of the intestate, in equal degree, and those who legally represent them." The literal signification of the term *next of kin*, or nearest kindred, we apprehend, will admit of no dispute. But whatever the term may intend, in its popular acceptation, the law, it is said, has given it a different, and much more limited signification, which is, next of kin of those, only, *who are of the blood of the first purchaser*. Though it be a general rule of construction, that the meaning of words is to be taken according to common acceptation ; yet if, on the present question, a contrary rule has been adopted and followed through a long series of judicial decisions, we could now only acquiesce. That such was, uniformly, the fact, until the case of *Buckingham*, in 1764, is confidently asserted by the counsel for the plaintiff. Unfortunately, however, the proof rests on this assertion, merely. The assertion would, therefore, be sufficiently answered by a simple denial. But, however the law might have been held, previously to 1764, it is conceded, that the authority of *Buckingham's* case maintained its ground in despite of the attacks of its numerous and powerful enemies, which, we are told, kept it in a state of constant warfare, until the revision of the statute, in 1784 ; which put an end to the contest. We do not, however, agree that the decision of *Buckingham's* case was an innovation upon the ancient law. The preamble to the statute of 1750 furnishes strong evidence to the contrary. " And whereas the lands and

June, 1808.    real estates of persons dying intestate, in this colony,
               *by ancient and immemorial custom, and common consent of*
HILLHOUSE      *the people,* have descended to and among the children,
    v.         or next of kin, of such intestate, as heirs of such in-
CHESTER.
               testate; and *the same,* by order of the courts of pro-
               bate, *have generally been divided to and among such*
               *heirs, in common, with the chattels, or moveable estate.*
               And the estates, *real and personal,* of persons dying in-
               testate, have, ever since the first settlement of this colo-
               ny, been divided among, and settled upon, the heirs of
               such intestate," &c. This preamble declares, that it had
               been an *immemorial custom* to divide the *real estate*
               among the heirs of the intestate, *with the moveable estate.*
               But it is certain, that, in the distribution of the *movea-*
               *ble estate,* no regard is paid to the blood of the first
               purchaser, neither here, nor in *England,* under the sta-
               tutues 22 and 23 *Car.* II.(a) but the parent will inherit
               before the collateral and more remote kindred. In the
               preamble, no mode of dividing *real estate,* different
               from that of distributing *personal chattels,* is mentioned;
               but it is expressly declared to have been the custom to
               divide the one *with* the other. This idea is corroborated,
               and a very satisfactory reason assigned, by the pream-
               ble to the statute prohibiting the sale of heiresses'
               estates, without their consent. "Whereas in the first
               settlement of this colony, *land was of little value,* in
               comparison with what it is now, by which means it be-
               came a general custom that the *real estate* of any per-
               son, which, either by descent, or by will, *became the*
               *estate of his daughters,* whether they were seised of it,
               at the time of their marriage, or whether it descended
               or came to them, during their coverture, *became thereby*
               *the proper and sole estate of their husband;* and might
               be, by them, alienated, or disposed of, without the know-
               ledge and consent of such wives." This statute was

(a) 2 *Bl. Com.* 520.

enacted in 1723. It conclusively shows, that, until
that period, the real and personal property of *femes*
*covert* were on the same footing, *both being absolutely*
*at the husband's disposal.* The reason was, that it " was
of little value," and therefore did not require to be
protected with more solicitude than property of a dif-
ferent description. The conclusion seems obvious, that
if the real estate of *femes covert* was not supposed to
deserve a greater degree of care than her personal pro-
perty, the former could not have been thought of suffi-
cient importance to be kept, inviolably, in the line of
the blood of the first purchaser.

But, in opposition to all this, and to show that the
decision of *Buckingham's* case was contrary to former
practice, it is said, that that case was so decided by a
vote of the house of representatives, obtained by *ex-*
*traneous influence*, and much against the opinion of the
council; who, it seems, at last concurred with a very
bad grace; and not until the people, at the instigation,
we suppose, of the *Hartford South Society*, had exerted
their *irresistible influence*, by removing some of the
most stubborn of the honourable body, and appointing
others, of a more pliant temper, to fill their places.
This, indeed, was an argument of such convincing
energy, that the members of the council ever after ac-
quiesced, even when on the bench of the superior
court; though, it is intimated, that *some of the judges*
regarded the decision with no great complacency; so
that *Parson Ross* himself, though, probably, a man of
abundant resolution, had too much " shrewdness in
point of property" to venture on a trial of the question;
but was fain to divide the estate with his antagonist, and
let the matter rest as it was.

As to the statute of 1727, it does not support the
construction contended for by the counsel for the de-

June, 1808.

HILLHOUSE
v.
CHESTER.

fendant, but directly the contrary. It gives no preference to the kindred of the intestate, who are of the blood of the first purchaser, unless they are, also, of the *whole blood* of the intestate, while the other kindred, in equal degree, are of the *half blood*. Neither does it vest the estate in the kindred of the *transverse* line, before those of the *ascendant* line, unless both are in equal degree. Thus, by that statute, the brothers and sisters inherit before the parent; " and the *parent*, from whom the intestate descended, shall be admitted before the *uncle*, or cousin german, or brother's children;" no regard being had, in this case, to the blood of the ancestor from whom the estate descended.

We remark, on the whole, that the construction of the statute, contended for by the defendant, is not justified by the words of the statute itself, nor by the purview of other statutes relating to a similar subject; nor does it appear to be authorized by ancient decisions. These decisions, indeed, are involved in much obscurity. But so far as they are known with any degree of certainty, they support the contrary doctrine. And if it may be said to savour of hardship, that the estate should be taken from the family of the original owner, and given to a stranger, it is to be recollected, that that hardship does not now exist, having been removed by later statutes. At all events, the precedent, about to be established, can have but a narrow operation, very probably not beyond the case by which it is occasioned.

By the Court. The statute of distributions, which was in force in this state, at the death of *Rachel*, places the real property of a person who died intestate upon the same footing as personal: that is to say, both kinds of estate were to be distributed to the same persons, without any regard to the maxim *seisina facit stipitem*. The claim, therefore, of the plaintiff to the land in ques-

tion, on the ground that she was the person last ac- <span>June, 1808.</span>
tually seised, as next of kin to her, fails; for on *Rachel's* <span>HILLHOUSE</span>
death, who left issue *Mary Chester*, her only child, the <span>v.</span>
lands descended to said *Mary*, and she was, although a <span>CHESTER.</span>
minor, legally seised of those lands as heir to her mo-
ther. This has always been the received opinion in
this state, and the practice has been conformable thereto,
that on the death of an ancestor the descent was cast
upon his heir, without any reference to the actual
seisin of such ancestor; and the right of such heir to
the real property of the intestate was the same as his
right to his personal property. The plaintiff cannot,
therefore, inherit this estate as next of kin to *Rachel*.
If he can inherit the estate in question, it must be as
next of kin to *Mary Chester*, his niece.

It cannot be pretended, that the plaintiff is next of kin
to *Mary*, if we give the same construction to the words
which they have received in the *English* law. The rule of
construction, which has obtained in that law, has been
uniformly the same, since their introduction into it.
By the statute of *Hen.* VIII. administration on the
estate of an intestate is directed to be given to the next
of kin. It has always been held, that to ascertain who
this person is, the computation of kindred is to be
made according to the rules of the civil law. So too
the statute of distributions, enacted in the reign of
*Car.* II. directs, that if there is no issue of the in-
testate, his personal property shall be distributed to
his next of kin. To ascertain who that person is, the
computation is always made according to the rules of
the civil law. Our statute, which directed that in such
an event the estate of the intestate, both real and per-
sonal, should go to the next of kin, was enacted at a
time when the aforesaid statute of *Car.* II., and the con-
struction given to it, was perfectly known. It is a
sound rule, that whenever our legislature use a term,
without defining it, which is well known in the *English*

law, and there has a definite, appropriate meaning affixed to it, they must be supposed to use it in the sense in which it is understood in the *English* law. In the present case, the father of *Mary* was her next of kin, according to the computation of the civil law, being in the first degree, whilst the plaintiff was in the third degree. For the same reason that *Mary's* personal estate would have gone to her father by the *English* statute, both her personal and real would go to her father by our statute, for he is her next of kin; and there is no possibility of resisting this conclusion, unless the term *next of kin*, when used in our statute, mean to point out one person, when real property is concerned, and a different person, when personal property is concerned.

It is to be observed, that there is no intimation in the statute, that those terms are to be understood in two different senses. Both kinds of estate are directed to be distributed to the *next of kin*. There must be some very cogent reason to induce a belief, that the legislature did not intend, in all cases, that both kinds of estate should go to the same persons.

It is claimed that the term *next of kin* in our statute, as it respects real property, means the next of kin *inheritable at common law*. So that when there are no issue of the intestate living at the time of his death, we must resort to the *English* common law to discover who may inherit his real property, by which law the ascending line is excluded, and every person in the collateral line, except the next collateral kinsman of the whole blood, who himself is of the blood of the first purchaser.

Certain it is, that the statute intimates no such thing. But it is contended, that this is the meaning of the terms, when real property is concerned. In the *English*

law of descents, we never find these words so used standing alone as in our statute. The rule in their law is, that on failure of issue of the person who died actually seised, his real estate shall go to his next collateral kinsman of the whole blood, who is of the blood of the first purchaser. It would be very strange, that the words next of kin in our law should designate the character just described, when they would not designate such person in their law. Where *A.* devised a real estate to *B.* his daughter for life, with remainder over in fee to his next of kin, without other words or explanation, it was determined, that on the death of *B.* this estate should go to the next of kin, computing kindred according to the rule of the civil law, and not to the next collateral kinsman of the whole blood, &c.

If the legislature of this state had discovered an anxiety in other respects to preserve entire the rules of descent established by the common law, it might have furnished some ground for a conjecture in favour of the plaintiff's claim ; but that is not the case. Instead of respecting the *English* law of descents, they have provided, that there shall be no preference given to males; that females shall inherit equally with them; and also, that there shall be no preference given to the eldest male. If then a man dies intestate, instead of the real property descending to the eldest son, to the exclusion of his brothers and sisters, it descends equally to all his children, whether male or female. The object of our statute is to distribute the estate of an intestate person equally among all those who are in the same degree of relationship ; and this object would be defeated, if such construction should be given to the term *next of kin* as is contended for by the plaintiff. For, if we consider the term as meaning such next of kin only as are inheritable at common law, then no person can inherit to the intestate, except the eldest male, however many

June, 1808. persons there may be in the same degree of kindred
according to the computation of the civil law. It must
HILLHOUSE be the next collateral kinsman to the intestate of the
v.
CHESTER. blood of the first purchaser; for he alone, as the next
of kin, is inheritable according to the *English* law of
descents. To adopt this rule, we must give a construc-
tion to the terms next of kin, which they have never
received before ; and this is to be done in opposition to
the manifest intention of the legislature, who enacted
the statute. It is opposed to the received opinions
among lawyers, and all the modern decisions in this
state.

New trial not to be granted.