CHARLES A. DICKINSON AND ANOTHER'S APPEAL FROM PROBATE.    42  491
                                                           64  291

A bastard in this state has inheritable blood for the purposes of collateral as well as lineal descent through him.
The estate of *A* held to be inheritable by *B* as heir at law, through *C* his grandmother, a sister of *A*, and *D* his mother, the illegitimate daughter of *C*.

APPEAL from a decree of a probate court approving the will of Eliza J. Cotton, deceased; taken to the Superior Court in Middlesex County. The appellees, the executors of the will, filed the following plea in abatement of the appeal:

· That the appellants ought not further to prosecute their appeal, nor ought the court to entertain further cognizance of the same, because the appellees say, that the said appellants had not at any time, either when said decree was passed or

when said appeal was takèn, nor have at this present time, any right, title or interest in or to the estate of the said deceased, or any part thereof, for the reasons following, to wit: The said Eliza J. Cotton, testatrix, died on the 22d day of November, A. D., 1874, at said Middletown, leaving a last will and testament which was duly proved and approved by the court of probate for the district of Middletown, by the said decree appealed from. The said testatrix was a maiden lady, having never been married, and leaving no parents, brothers or sisters, and no blood relative nearer than an own cousin. The appellants are legitimate children of an illegitimate daughter of Mary Cotton, a sister of the said testatrix. And at the time of the decease of the said testatrix, her said sister Mary, and the illegitimate daughter of the said Mary, being the mother of the appellants, had both been dead for a period of more than fifteen years. All which the said appellees are ready to verify. Wherefore they pray that said appeal may be dismissed, and that the court will entertain no further cognizance of the same.

To this plea the appellants demurred, and the questions arising on the demurrer were reserved for the advice of this court.

*Warner* and *S. A. Robinson*, in support of the demurrer.

1. The maxim of the common law of England, that the bastard is the child of no one, and has no inheritable blood, has never been adopted in this state. In the infancy of our judicial history, it was rejected by the better impulses of our jurists as having no foundation in fact, and without any sanction on the ground of public policy; and it is now the settled doctrine of this state, that an illegitimate child in all its relations to its maternal ancestry is subject to all the obligations which the law or society imposes on legitimate offspring, and entitled to all the rights of such. Thus, WILLIAMS, C. J., in *New Haven* v. *Newtown*, 12 Conn., 178, says:—"The fundamental maxim of the common law, that a bastard is *filius nullius*, is entirely rejected here, and such a child is here recognized by law as the child of its mother, with all the rights and duties of a child."

2. This maxim being, as Judge WILLIAMS characterizes it, a fundamental one, its rejection by our courts has led to an entire departure from all the common law rules that determine the rights of illegitimates in all their relations to society, and to a course of decisions that not only justifies, but to preserve its harmony demands, the judicial recognition of their capacity to transmit a collateral inheritance. As some of the incidents of the rejection of the English doctrine, our courts have held—that in most respects a settlement by parentage is analogous to an interest acquired by inheritance. *Marlborough* v. *Hebron*, 2 Conn., 22. That illegitimate children take their settlement, not from the place of their birth as in England, but from the place of the settlement of their mother. *Canaan* v. *Salisbury*, 1 Root, 155. The court there say:—"This is agreeable to the law of nature and reason;" and this was considered by the reporter so fundamental and important, that in the introduction to his reports he states this doctrine as the common law of this state, as distinguished from the common law of England; and declares that these principles have stood every attack of a century. See also *New Haven* v. *Newtown*, 12 Conn., 165, and cases there cited. And Judge HOSMER in *Heath* v. *White*, 5 Conn., 235, says, on the question of support:—"I entertain no doubt that on the same principle, in the event of the mother's impotency, her bastard child is compellable, if of sufficient ability, to provide for her support." The mother too is the natural guardian of her illegitimate child, and has the right to its custody and control, and is bound to maintain and educate it. 1 Swift Dig., 47. Their intermarriage would be unlawful, and any sexual intercourse between them incestuous. 1 Swift Dig., 48. Illegitimate children of the same mother can inherit from each other. *Brown* v. *Dye*, 2 Root, 280. Illegitimate children inherit from their mother. *Heath* v. *White*, 5 Conn., 228. And legitimate and illegitimate children of the same mother take equally of her estate. Ib. And in this connection it is to be observed that Blackstone, (1 Com., 459,) in speaking of bastards says:—"For being *nullius filius* he is therefore of kin to nobody, and has no ancestor from whom any inheritable

blood can be derived;" thus indicating clearly that this maxim was regarded by that learned writer as the parent of all the rules and *dicta* of the English courts limiting the rights of illegitimates. And by the rejection of this maxim all the outgrowths of it are rejected, and necessarily fall to the ground. Hence we logically deduce, that there is no distinction whatever as to succession, descent, distribution, inheritance, or settlement, between legitimate and illegitimate children so far as their maternal ancestors are concerned; and that illegitimate children are just as certainly "legal representatives" of their mother and maternal ancestors, as legitimate ones, in the absence of any restraining words in the statute of distributions.

3.   Our statute of distributions contains no language which limits the rights of children to those who are legitimate, so far as their maternal descent is concerned. Under our law of descent the doctrine of primogeniture is wholly exploded. Parents may inherit the estate of their intestate sons; and brothers of the half blood shall not be excluded by collateral kinsmen in remote degrees. The female sex is placed upon the same footing with the other sex in respect of their succession to property; and, we add, that the word "child" means the child of its mother, legitimate or illegitimate, and such child may inherit its mother's estate; and illegitimate children may inherit from illegitimate children, and legitimate children from illegitimate of the same mother, and *e converso*, and legitimate and illegitimate children of the same mother take equally of her estate; and by these radical changes in our statute nearly all the fundamental maxims of the English laws regarding descent of property are overturned; and we submit that it is useless to argue from any analogy of the English law touching any question affecting our statute of distributions or common law on this subject, and our courts have always carefully avoided any such course. Under the English law, and indeed the law of other states that will be quoted against us, the word "child" means the offspring of a lawful marriage, and when that construction was attempted to be forced upon our court, in the case of *Heath* v. *White*, it

was repudiated by it as contrary to the plain dictates of reason and the language of the statute; and in that case, so far as this class of unfortunate persons was concerned, they were placed under the full protection of the law, and the court then announced that they were willing to abide by that decision with all its attending consequences in all analogous cases; Judge HOSMER closing his remarks on this point with these emphatic words:—"I cannot admit any influence on my opinion from the common law of England, which has never been adopted here." And they have carefully hedged in this doctrine by denying emphatically that the decisions of other states can have any effect on our determination of these questions. If the word child as used in the statute includes, in any instance where an interpretation has been given, an illegitimate child, then in every instance it means the child of its mother, whether born in or out of wedlock. The clause of the statute applicable to this case is as follows:—"Equally to brothers and sisters of the intestate of the whole blood and those who legally represent them." And the language of the statute of 1803 is the same in substance, and both of them use the expression "brothers and sisters of the half blood." This language will permit illegitimates to inherit from each other, and also permit illegitimates to inherit from legitimates, and *vice versâ*, legitimates from brothers and sisters born illegitimately. In all of our statutes of distributions, from the earliest, when our state was yet a colony, the language on this subject is practically the same, and we find the most satisfactory proof that they are laws "peculiarly our own." The language of our statutes with regard to representatives of deceased persons supports this view. Thus the statute of 1803 uses this language:—"No representatives to be admitted among collaterals after brothers' and sisters' children." Here the terms "brothers' and sisters' children" are unrestrained by any such words as "born legitimately." And herein we have conclusive evidence that the legislature neither intended nor wished to place any such restraint upon the term "legal representative." That term is synonymous with lineal descendant and can not be confined to lawful issue. 1 Swift

Dig., 116.   We have no right to restrain the plain language used to legitimate children, or to say that illegitimacy breaks the line of representation.   Nor has the change which was made in this statute in 1821 let in any such restraint.   The statute of 1803 was changed in that year, so as to read "no representatives to be admitted among collaterals after the representatives of brothers and sisters," instead of "no representatives to be admitted among collaterals after brothers' and sisters' children."   The children of brethren and sisters were legal representatives, and then the right of representation ceased among collaterals.   The altered language of the present statute is not language of restriction, but on the contrary of enlargement of the old statute of 1803, to let in grandchildren of brothers and sisters.   Swift says this was the purpose and effect of the alteration.   The same term "legal representatives" is used in the old as in the present statute, and used evidently to prevent repetition.   The old statute gives the right of representation to children, unrestricted as to legitimacy, and affirms them to be legal representatives, and likewise by implication, (else the limitation would be superfluous,) affirms that grandchildren of a brother or sister would in the absence of the limiting clause be legal representatives.   The present statute does not use the expression "grandchildren of brothers and sisters," but instead makes use of the term "legal representatives," the indisputable purpose and effect of which is to admit grandchildren to the right of representation, likewise without any restraint as to their legitimacy or the legitimacy of their mother.   The expression "legal representative" being clearly interpreted by the statutes themselves to mean child or grandchild, (saying nothing now of legitimacy or illegitimacy,) and the expression "child" as used in one place in the statute having been repeatedly interpreted to mean legitimate and illegitimate; then wherever else the term "child" is used in that same statute, or any other words signifying child, both the word itself and the substituted phrase must, by the plainest rule of construction, have the same meaning attached to them as to those which have received a specific interpretation.

4. Nothing better commends the wisdom of the policy which our courts have adopted on this subject, or more emphatically indicates the folly of an adoption of the English common law rule, than the system of statute laws which many of our sister states have made their laws of descent. These states by successive alterations, during a long series of years, have just arrived at the doctrine which our courts have held for the last hundred years, and held by simply sweeping out of sight and consideration the English maxim of "*filius nullius.*" Schouler, in his work on Domestic Relations, p. 381, says there is scarcely a state in the Union that has not departed widely from the policy of the English common law with regard to the rights of illegitimate children.

*Hubbard* and *Bacon*, contra.

The plain question presented upon this record, is whether an illegitimate child is under any disability whatever by the law of Connecticut, as to inheriting or transmitting inheritance. Because if these appellants can inherit by representation, *through a bastard mother*, all the rights of inheritance of her mother, and the bastard mother can transmit inheritance to her children, so as to make them next of kin to all the collateral kindred of the mother of the bastard, then illegitimate children are under no disability whatever, but are equal in every respect on the side of the mother to her legitimate offspring.

Unlike most of our sister states, we have no special statute giving to bastard children the capacity of inheriting from their mothers, but such a construction was given to our statute of distributions, in an early case, as to allow a bastard to be a child of its mother within the purview of that statute. *Heath* v. *White*, 5 Conn., 228. The doctrine laid down in that case was severely criticised by Chief Justice Parker, of Massachusetts, in the case of *Cooley* v. *Dewey*, 4 Pick., 93, on the ground that a different meaning was given to the word child, in a statute, from that which it invariably has in a will, where it always means a legitimate child and never an illegitimate. And the court in Massachusetts, in that case, refused

to be governed by the case of *Heath* v. *White*, in interpreting the word child in the Massachusetts statute of distributions. However, the case of *Heath* v. *White*, unless it can be made to advance the doctrine which the appellants are contending for, is satisfactory to the sense of justice of every one, in allowing a bastard child to inherit from its own mother. But if the court of Connecticut, by this decision, have made a bastard the heir at law of all those from whom its mother or its grandmother might have inherited,—if a spurious brood can hand on inheritance, even through a line of bastards, it would be better to return to the ancient rigor of the common law, and establish in Connecticut, as law, the old maxim, "*Heres legitimus est quem nuptiæ demonstrant.*" In a late case the Supreme Court of Massachusetts refused to allow a bastard to be a child within a statute making provision for children, where they had been omitted in a will. *Kent* v. *Barker*, 2 Gray, 535. In nearly all the states of the Union there are the most liberal statutes, giving bastards the power of inheriting from their mother, and yet in no instance has a bastard been allowed to inherit from collateral kindred of its mother. Our courts must take a new departure if they make such inheritance lawful. In Massachusetts it was held that bastard children could not inherit from their maternal grandmother, who outlived their mother, even under a statute allowing them to inherit from their mother. *Curtis* v. *Hewens*, 11 Met., 294. After this decision a statute was passed allowing illegitimates to inherit from their mother and her ancestors, and yet under this statute they cannot inherit from their mother's collateral kindred. *Pratt* v. *Atwood*, 108 Mass., 40. In Vermont it was early decided that one illegitimate child could inherit from another illegitimate child of the same mother. *Town of Burlington* v. *Fosby*, 6 Verm., 83. But this does not allow a bastard to inherit through its mother from a legitimate child. *Bacon* v. *McBride*, 32 Verm., 585. Nor can a bastard inherit from collateral kindred of its parents, even when made legitimate by a special act of the legislature. *Moore* v. *Moore*, 35 Verm., 98. In Pennsylvania it has been held that a bastard niece legitimated by a

proper tribunal in Tennessee could not inherit. *Smith* v. *Derr's Admrs.*, 34 Penn. S. R., 126. The law is the same in Kentucky. *Allen* v. *Ramsey*, 1 Metc. (Ky.), 635. In Ohio, under a statute providing that "bastards shall be capable of inheriting or of transmitting inheritance on the part of their mother, in like manner as if they had been born in lawful wedlock," they cannot inherit from collateral kindred of their mother. *Gibson* v. *Moulton*, 2 Disney, 158. In the above case the evils of any other doctrine are well set forth. A similar statute is interpreted in the same way in *Stephenson's Heirs* v. *Sullivant*, 5 Wheat., 207. In Connecticut we provide that where a child is adopted by agreement in writing, approved and recorded in the court of probate, "such child shall thereupon become the legal child of the person by whom it shall be so adopted, and he shall become its legal parent with all the rights and duties between them of a legitimate parent and child, except as may have been otherwise stipulated in such agreement;" and yet, in such a case, so abhorrent is it to justice and propriety that a person should be permitted to make heirs for others, except through the institution of the family, our legislature is careful to guard the above provision with these significant words, "but such child shall not by virtue of such adoption inherit estate except from the adopting parent." *A fortiori* an illegitimate child ought not to inherit, except from her who gave it being.

For these reasons we say that these appellants have no interest in the estate of Eliza J. Cotton, and that the Superior Court should be advised to dismiss their appeal.

FOSTER, J. The appellants are the grandsons of Mary Cotton, their mother being her illegitimate daughter. Mary Cotton was a sister of the testatrix, Eliza J. Cotton, and it is from the decree of the court of probate approving her last will that this appeal was taken. The mother and grandmother of the appellants had been dead some fifteen years at the time of the death of the testatrix, who was a single woman, having never been married. She left no parents, no brothers or sisters, and no blood relations, unless the appel-

lants are to be so considered, nearer than cousins.   In the Superior Court the appellees moved to dismiss the appeal on the ground that the appellants were not heirs at law of the deceased, and had no interest in or title to her estate.   The question thus raised is reserved for the advice of this court.

Were this question to be decided by the common law of England we should, without hesitation, advise that the appeal be dismissed.   The appellants derive their title through their mother, and succeed to the same rights to which she, if living, would succeed.   She was an illegitimate.   In the XCVII number of the Edinburgh Review, in an article on the law of legitimacy, Gardner Peerage case, it is stated that at the time of the conquest bastards could inherit land in England, and also in Wales before the statute of Wales, 18 Edw. I.   If this were so, the law was soon changed.   Glanville, the earliest writer on the common law, says: "Neither a bastard, nor any other person, not born in lawful wedlock, can be, in the legal sense of the term, an heir."   *Heres autem legitimus nullus bastardus, nec aliquis, qui ex legitimo matrimonio non est procreatus, esse potest.*   Lib. 7, Cap. 13.   This rule, though modified in some respects by various acts of Parliament since passed, is, substantially, the law of England at this day.

The denial of all rights as an heir was not the only disability to which this class of persons was subjected in England. A bastard was the child of nobody; he was not entitled even to a name.   It is however gravely asserted by the text writers that he might gain one by reputation.   He did not take his mother's place of settlement, but was settled wherever he chanced to be born.   As he was related to nobody he could have no heirs, except of his own body; and so if he left no descendants, his property escheated, and now, by law, escheats to the crown.   *In re Wilcox Settlement*, 1 L. R., Chan. Div., 229.   He was incapable of holy orders, and disqualified from holding any dignity in the church.   In Germany, no farther back than the time of the Reformation, bastards could not give evidence on the rights of citizens, and down to a very recent period certain Saxon local laws enacted that no persons of illegitimate birth should officiate in any judicial office.

Inquiries were made into the birth of a person, at the academies and schools, before he was admitted to the degree of doctor, or any other high dignity.    By the law of Scotland he was disabled, *ex defectu natalium*, from bequeathing by testament without letters of legitimation from the sovereign.    By statute, 6 Will. IV, Cap. 22, this disability was removed. The preamble of the act says: " Whereas, it is just, humane, and expedient, that bastards, or natural children, in Scotland, should have the power of disposing," &c.    By statute 7 and 8 Vict., Cap. 83, trustees or managers of savings banks are empowered to pay the money deposited by an illegitimate depositor, dying intestate, to the persons who, in their opinion, would have been entitled to the same according to the statute of distributions, if he had been legitimate.

While the law was and is thus rigorous in its application to persons born out of lawful wedlock, it was remarkable for the liberality with which it regarded all those who were born in wedlock.    No matter how soon after the marriage a birth followed, the offspring was legitimate.    All children born during the coverture, though the wife lived apart from her husband in notorious adultery, were, for a long time, held legitimate, unless the husband was proved to be impotent, or beyond the four seas for so long a period before the birth as to make it a natural impossibility that he could be the father.    As to posthumous children, the law, at times, has gone to foolishly absurd lengths to hold them legitimate.    In the time of Edward II, the Countess of Gloucester bore a child one year and seven months after the death of the duke, and it was pronounced legitimate.    In the reign of Henry VI, Mr. Baron Rolfe expressed the opinion with apparent gravity, that a widow might give birth to a child seven years after her husband's death without injury to her reputation.

The Roman law was much less severe, and imposed fewer disabilities upon bastards than the common law.    Bastards could inherit from their mothers.    A distinction was made between illegitimates born of a concubine, and those born of a prostitute.    The former were styled *naturales*, the latter, *spurii*.    The concubine had a legal relation to the family,

which was sanctioned by the church down to the Council of Trent; and by subsequent marriage her offspring were made legitimate. The *naturales* were not only lawful heirs of the mother, but were entitled to support from the father. The *spurii* had no legal rights of inheritance or to a support.

The laws of the different states of our Union differ widely as to the rights of illegitimates. Most of the states have passed statutes mitigating more or less the rigors of the common law, and conferring rights which that law denied. The general tendency seems to be one of increasing liberality. In most, if not in all of the states, they inherit from the mother, and the mother from them. In some states they inherit from each other, from collateral kindred, and from the father, when there has been a general, notorious, and mutual recognition. In many of the states subsequent marriage of parents legitimates. Connecticut is one of the very few states, possibly the only one, that has passed no statute defining the rights of bastards. We have a common law of our own, built up from the usages and customs of our people, and from various judicial decisions. It differs from the common law of England and from the Roman law.

The earliest case in our reports, where the rights of this class of persons were judicially considered, is *Canaan* v. *Salisbury*, 1 Root, 155. That was a settlement case, and it was held that a bastard was settled with the mother. The court said that such a rule was agreeable to the law of nature and reason. This was in 1790, and was a clear departure from the common law of England, which did not permit an illegitimate child to inherit even a local habitation or a name from the mother. This case, though decided by the Superior Court, has never been doubted, but always recognized as sound law. It has been followed and sanctioned by this court in divers cases. *Hebron* v. *Marlborough*, 2 Conn., 18; *Windsor* v. *Hartford*, id., 356; *Danbury* v. *New Haven*, 5 Conn., 584; *Oxford* v. *Bethany*, 19 Conn., 229; *New Haven* v. *Huntington*, 22 Conn., 25.

In the case of *Woodstock* v. *Hooker*, 6 Conn., 35, it was decided that a bastard born in Massachusetts, of a mother

having a settlement in this state, took the settlement of the mother. PETERS, J., who gave the opinion of the court, said: "It has been discovered in this state that a bastard is the child of his mother," (p. 36.) In *Guilford* v. *Oxford*, 9 Conn., 321, it was decided that a bastard child took the new settlement of its mother acquired by marriage, though the marriage was procured by the fraud of the mother, she being pregnant at the time, and concealing that fact from her husband, who supposed her to be a chaste woman. In *New Haven* v. *Newtown*, 12 Conn., 165, it was held that the new settlement of a mother acquired by marriage was communicated to her illegitimate children, whether born before or after the marriage. WILLIAMS, C. J., said: "The fundamental maxim of the common law, that a bastard is *nullius filius*, is entirely rejected here, and such a child is here recognized by law as the child of its mother, with all the rights and duties of a child," (p. 170.) The cases of *Newtown* v. *Fairfield*, 18 Conn., 350, *Oxford* v. *Bethany*, 19 Conn., 229, and *New Haven* v. *Huntington*, 22 Conn., 25, are to the same effect. In *Bethlehem* v. *Roxbury*, 20 Conn., 340, CHURCH, C. J., said: "The feudal, repulsive doctrine of the common law, that a bastard child has no parent, no protector, not even a mother, has never found favor in this state."

In the case of *Brown* v. *Dye*, 2 Root, 280, it was decided that under our statute of distributions a bastard might take as a brother to one who was born of the same mother. This was in 1795, and the decision was rendered by the Superior Court. The court said: "The common law of England, which has been urged in this case, is not to be mentioned as an authority in opposition to the positive law of our state, and nothing can be more unjust than that the innocent offspring should be punished for the crimes of their parents by being deprived of their right of inheriting by the mother, when there doth not exist among men a relation so near and certain as that of mother and child." The doctrine of this case was recognized and followed by this court in the case of *Heath* v. *White*, 5 Conn., 228, where it was held that a bastard might inherit real estate from his mother, as a child. That case

apparently recognizes the relation of parent and child between the mother and her illegitimate offspring to be legally as perfect as between the mother and her legitimate offspring; giving the same rights, imposing the same duties.

It is abundantly clear from this examination of our law that we have departed very widely from the common law of England as applicable to illegitimates.   We have been thus minute in the examination of the authorities, even at the expense of some prolixity, in order to determine whether the question before us has not, in effect, been long since disposed of; whether the principles recognized as established, nearly a century ago, and ever since upheld and adhered to, are not conclusive.

We have seen that it was at first held that a bastard derived its settlement from its mother, not from its place of birth. This was analogous to an interest derived by inheritance, and recognized the legal relation of parent and child.

It was next held that illegitimate children of the same mother could inherit from each other.   This recognized the relation of brother and sister.

· It was then held that an illegitimate child could inherit from its mother; and so the relation of parent and child was most directly recognized, and the reciprocal rights and duties growing out of that relation were thoroughly established.

. The learned counsel for the appellees, admitting that a wide difference exists between our law and the English common law as to the rights of illegitimates, still insists that, under our law, their right, and the right of their descendants, is strictly lineal, never collateral; and so the appellants have no rights as heirs at law of the testatrix.   In the expressive language of the counsel, though this progeny be grafted on the lineal stock, it has not been grafted on the collateral, and it is urged that this ought not to be done; that it will be taking another and farther departure from the wise principles of the common law, and that it will tend to encourage immorality and impair the sanctity of the marriage relation.   These views have been pressed upon us so eloquently and so forcibly that we should regret to be thought insensible to the appeal. .

If however we find the law to be in favor of the appellants, whatever we may think of its wisdom or its policy, we must so pronounce it. When the earls and barons of England, in the parliament of Merton, were asked by the bishops to change the laws of the realm and make those children who were born out of lawful wedlock, legitimate, by the subsequent marriage of their parents, as they were by the canon law, they made that reply which has since been so famous in history, *Nolumus leges Angliæ mutare.* Whether we are asked to abridge or extend the rights of illegitimates, our reply must be, not that we are unwilling, " *nolumus;*" or that we are willing, *volumus;* but that we are unable, *non possumus,* to change the laws of Connecticut. That high prerogative has not been granted us. We sit here to declare the law, not to change it.

After as careful a consideration of the question as we have been able to give, we think that the points decided in the cases we have quoted tend strongly to the conclusion that these appellants, by the law of Connecticut, are heirs at law of the testatrix, Eliza J. Cotton.

We might, we think, safely rest our decision here, but as the question is one of much importance, our statute of distributions ought perhaps to be examined, and its construction considered, before reaching a positive conclusion.

The earliest provision in our colonial laws as to the distribution of estates was in 1639. At the October term of the General Court in that year, an order was passed directing the "orderers of the affairs of the towns," when any person should die intestate, " to cause an inventory to be taken, and then the public court may grant the administration of the goods and chattels to the next of kin, jointly or severally, and divide the estate to wife, if any be, children or kindred, as in equity they shall see meet," &c. Col. Rec. 1636 to 1665, p. 38. This order was embraced in the code of 1650, usually styled Mr. Ludlow's Code. Id., 553.

In the revision of 1673 some alterations appeared. After providing for the inventory, now to be made by the selectmen, and the granting of administration, the court was then directed "to divide the estate to wife, if any be, and children

VOL. XLII.—64

or kindred according to law; and for want of law, according to rules of righteousness and equity."

In 1699 our statute of distributions, properly so called, copied substantially from a law of Massachusetts of 1692, was passed. Some alterations have been made in it from time to time, but the clauses bearing on the question before us, "to and among his children, and such as shall legally represent them, and if no child to the next of kin to the intestate," have been changed but slightly in terms, and not at all in meaning. By the common law no doubt the terms "child" and "children," when used in statutes, wills, and legal instruments generally, meant legitimate child and legitimate children, just as positively as if the term "legitimate" were prefixed. The case of *Dorin* v. *Dorin*, 7 Eng. & Irish App., 568, decided by the House of Lords during the past year, carries this principle to such an extent as in our opinion entirely to frustrate the intent of the testator and leave the corpus of the estate undisposed of. The still more recent case, *In re Ayle's Trusts*, 1 L. R., Chan. Div., 282, decided since this case was argued, holds the same doctrine.

We cannot think that this was the meaning which our legislature affixed to these words in this statute. That body was made up generally of plain men, and they made laws for plain men. That they understood the terms "child" and "children," so far as the mother was concerned, to comprehend her illegitimate, as well as her legitimate offspring, we entertain no doubt. They used those terms in their common, popular signification, rather than with reference to any legal or technical sense. They had as little reference to the technical meaning of words in the English common law, as they had to the English law of inheritance, which they disregarded altogether. Looking more to the example of the Hebrew patriarchs and to Job, who gave his daughters inheritance among their brethren, than to the common law of England, they distributed lands to daughters, equally with sons, except that the eldest son took a double portion. The famous case of *Winthrop* v. *Lechmere* was an appeal from our colonial courts to the king in council. Mrs. Lechmere, the sister of

Mr. Winthrop, had been granted a share with him in the lands of their father and uncle. The order in council on the appeal, passed in 1727, reversed all the decrees of our colonial courts in favor of Mrs. Lechmere, and pronounced our law for the settlement of intestate estates null and void.

In the revision of the laws in 1750 this preamble to the law appeared: "Whereas, the lands and real estate of persons dying intestate in this colony, by ancient and immemorial custom and common consent of the people, have descended to and among the children, or next of kin of such intestate, as heirs of such intestate," &c., &c. "Therefore, be it enacted," &c. This preamble was probably all the apology which our colonial legislature was disposed to make for the discrepancies between our law of inheritance and the law of England. The importance of this preamble, in this connection, is to show that our law grew out of the customs and usages of the people. The terms used in it therefore should not be construed with reference to like terms in an act of parliament, but rather with reference to their ordinary, popular signification here in the colony. The numerous decisions which we have quoted from our reports, from the earliest to the latest, recognize the relation of mother and child, existing as well when the child was illegitimate as when legitimate. That an illegitimate child is as certainly next of kin to its mother as a legitimate child, seems to us a proposition that does not require proof. We think of no plausible reason that can be given to the contrary.

If the mother of these appellants had died before her marriage, leaving her mother, Mary Cotton, surviving, that mother would have been her heir at law. The testatrix, that mother's sister, on her death, would have been her heir at law. Thus the testatrix, indisputably, would have succeeded to the estate, had there been any, of her illegitimate niece. Would the death of the mother of the illegitimate niece have made any difference? Would not the testatrix still have been entitled as heir at law? As her sister's heir, would she not have been entitled to stand in her sister's place as her legal representative, and so claim as next of kin to the intestate? This was

the precise question in the case of *Cooley et al.* v. *Dewey*, 4 Pick., 93. The uncle and aunt of a bastard claimed his estate as heirs at law, his mother being dead. The court, Parker, C. J., said: "The merits of the appeal depend on the question whether the mother of the deceased, he being a bastard, was, within the meaning of our statute of distributions, his next of kin; for if she succeeded to his estate on his death, the appellants [her brother and sister] would of course take the whole between them, either as heirs of their sister, or, through her, as next of kin to the intestate." The court held that the law recognized no legal relation between a bastard and his mother any more than between him and his father; that being *nullius filius*, he was as much without mother as without father.

Our law is admitted to be otherwise, so far as the mother is concerned, and so far as rights of inheritance, lineally, are involved. The Supreme Court of Massachusetts, as we have shown, did not recognize the distinction now insisted on between lineal and collateral rights. They said that the mother could not inherit from the bastard, and therefore that the uncle and aunt could not. If the mother could inherit, then the uncle and aunt might and would inherit. As it is clear that in this state the mother would inherit, it would seem to follow as a necessary consequence that, she being dead, her sister would inherit, and so Eliza J. Cotton, the testatrix, would, in the case supposed, have been heir at law to the mother of these appellants.

Now if there be no obstacle, and we discover none, to having an estate pass from an illegitimate child through its mother to her collateral relations, can there be any obstacle to the passing of an estate from collateral relations, through its mother, to an illegitimate child? If any discrimination is to be made, ought it not to be the reverse of that claimed? Do not reason and justice loudly demand that the disability should fall on the erring parent rather than on the innocent child? *Culpa tenet auctores*, is an old and just maxim.

A fair construction of our statute of distributions leads us therefore to the conclusion that these appellants have an

interest, as heirs at law, in the estate of the testatrix. Nor does it seem to us that in reaching this result we are making a farther departure than we have already made from the English common law. The cases heretofore decided in this state involve principles which must control this case, and the decision we make is necessary to vindicate those principles and preserve the symmetry of our law.

But the appellees quote to us a number of cases decided in states where, by statute, bastards are authorized to inherit from their mothers, and their mothers from them, and yet all right of inheritance among collaterals is denied.

To these cases we deem it a sufficient answer in the first place to say, that in all those states the doctrine of the common law as to a bastard, that he was *nullius filius*, was considered as established. The statute, being in derogation of the common law, was therefore to be construed strictly. The bastard was to inherit to the extent, and only to the extent, specified in the statute. If the statute gave him a morsel of bread, the common law gave him a stone if he asked to have that morsel of bread enlarged.

In Connecticut, as we have seen again and again, this doctrine of the common law as to bastards never obtained, and so these decisions lack applicability.

In the next place, an examination of these decisions will show that they are not all opposed to the rights now claimed by these appellants. The case of *Cooley* v. *Dewey* is, as we have seen, clearly an authority in favor of the appellants, if the right to inherit between the mother and an illegitimate child be established, as it is agreed to be, by our law. To the other cases quoted from Massachusetts, *Curtis* v. *Hewins*, 11 Metc., 294, *Kent* v. *Baker*, 2 Gray, 535, and *Pratt* v. *Atwood*, 108 Mass., 40, it is sufficient to say, that the statute of Massachusetts, which made the bastard heir of his mother, had this limiting clause, "that he shall not be allowed to claim as representing his mother, any part of the estate of any of her kindred, either lineal or collateral." This statute was passed after the decision of *Cooley* v. *Dewey*.

The cases quoted from Vermont, *Burlington* v. *Fosby*, 6

Verm., 83, and *Bacon* v. *McBride*, 32 Verm., 585, were decided under a statute of that state. That statute provided "that illegitimate children shall be capable of inheriting and transmitting inheritances, on the part of the mother, in like manner as if they had been lawfully begotten." It was held in *Burlington* v. *Fosby*, that one illegitimate child could inherit from another illegitimate child of the same mother. Subsequently it was held in *Bacon* v. *McBride* that an illegitimate child could not inherit from a legitimate child of the same mother. This is clearly inconsistent with the doctrine of *Burlington* v. *Fosby*, the soundness of which is questioned by the latter case. *Burlington* v. *Fosby* is entirely in harmony with the decisions made by this court, and whether that case, or the case of *Bacon* v. *McBride*, is sustained by the better reasoning, we will not now attempt to decide. *Moore* v. *Moore*, 35 Verm., 98, does not involve at all the question we are now considering, and only alludes to it by way of illustration.

In the case of *Stevenson's Heirs* v. *Sullivant*, 5 Wheat., 207, it was held that under the law of descents in Virginia, illegitimate children could not inherit from a legitimate child of their mother. This is quite inconsistent with *Brown* v. *Dye*, which we must consider law in this state.

The case of *Gibson et ux.* v. *Moulton*, 2 Disney's Rep., 158, was decided by the Superior Court of the city of Cincinnati, under a statute of Ohio similar in character to the statute of Vermont already quoted. It was held that this statute applied to inheritances in the ascending and descending lines only. This case however is directly contradictory to the case of *Lewis* v. *Eutsler*, 4 Ohio State Rep., 354, where it was held that illegitimate children could inherit from an older illegitimate child of their mother. Ranney, J., who gave the opinion of the court, says: "A man needs little more than his instincts to determine what the law ought to be in such a case." This case speaks approvingly of *Burlington* v. *Fosby*, and disapprovingly of *Stevenson's Heirs* v. *Sullivant*.

The high authority of Chancellor Kent is invoked to sustain the distinction between a bastard's right to inherit lineally

and collaterally. Without instituting any comparison between men of renown in the profession, we may say that a former honored chief justice of this court, in his treatise on Descents, in commenting on the meaning of statutes which made illegitimate children capable of inheriting and transmitting inheritances on the part of the mother, in like manner as if they had been lawfully begotten, says: " By the terms, ' on the part of the mother,' we are to understand not only that the mother may inherit to the illegitimate children, and the illegitimate children to the mother, but that any relative on the part of the mother may inherit to the illegitimate child, and the illegitimate child may inherit to any relative on the part of the mother." Reeve on Descents, 96.

In giving this construction to our statute of distributions we simply carry out the construction long since adopted. That was, as we think, a correct interpretation of the will of the legislature. That the legislature for many intervening years has passed no act to amend or alter the law as decided, affords strong evidence that their will has not been misinterpreted. We prefer to stand *super antiquas vias*, rather than introduce a new policy.

Arriving as we do, unhesitatingly, at the result, both by the common law of this state, and by our statute of distributions, that these appellants are heirs at law of the testatrix, we shall add little, and perhaps should add nothing, as to the character or tendency of the law. The removal of disabilities from illegitimates, so as to leave them capable of inheriting and transmitting inheritances on the part of the mother, collaterally, as well as lineally, like other persons, is sharply denounced. Facts however, we believe, fail to show either the immorality or impolicy of our law. We have been at some pains to examine the statistics on this subject, but have not been able to obtain returns from any of our sister states. We doubt if such returns are generally made. In ten years ending on the 31st day of December, 1874, there were born in this state 137,396 children, of which 1,118 (eighty one-hundredths of one per cent.) were illegitimate; as small a ratio, we venture to assert, as can any where be found. In

England, for three years prior to and including 1860, the ratio of illegitimate to legitimate births was over 6½ per cent.; and in Scotland, for ten years ending in 1870, it was 9.77 per cent. On the continent, so far as we have had access to the returns, the ratio is, generally, much larger. The number of illegitimates now in England and Wales alone is over one million. Surely it is not beneath the consideration of a wise statesmanship, whether it is just or prudent to cut off so large a portion of the population, who are charged with no crime, from all rights of inheritance, and isolate them almost absolutely from the body politic. In Guienne, near the beginning of the 14th century, a horde of banditti, organized and led by the illegitimate sons of noblemen, ravaged a portion of the country, and burned several towns, taking that mode of revenge for being denied their rights of inheritance.

In presenting our views thus fully, we regret that we have been compelled to occupy so much space. We advise the Superior Court to render judgment for the appellants.

In this opinion the other judges concurred.