JAMES CAMPBELL'S APPEAL FROM PROBATE.

Third Judicial District, Bridgeport, April Term, 1894. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The rule of the common law which excluded from inheritance all who traced their descent through alien ancestors, and therefore through uninheritable blood, has never been in force in Connecticut.

Where the facts alleged in an appeal from a decree of the probate court disclose no legal interest upon the part of the appellant in the subject-matter of the appeal, the cause will be erased from the docket of the Superior Court on motion of the appellee. In such case the general allegation of interest is a mere legal conclusion from the specific facts averred and cannot avail the appellant.

The erasure is not erroneous because a state of facts, not alleged, might be supposed, which would justify the taking of the appeal. If such facts do exist it is incumbent upon the appellant to aver them in stating the grounds of his appeal; otherwise they cannot be considered on the motion to erase.

[Argued April 24th—decided May 4th, 1894.]

APPEAL from an order and decree of the Probate Court for the district of Bridgeport, ascertaining the heirs at law and distributees of the intestate estate of Patrick Sloan: taken to the Superior Court in Fairfield County where the cause was erased from the docket by the court, *Shumway, J.*, and the appellant appealed to this court. *No error.*

The next of kin of the intestate were a brother who was an alien, and five first cousins who were naturalized citizens of the United States. The decree gave the personal estate to the alien brother, and the real estate to these cousins. The appellant, a natural born citizen of the United States, was a second cousin of the deceased, son of a first cousin who had died before him. The intestate was a naturalized alien, and all the cousins traced their kindred to him through alien ancestors.

These facts appeared on the face of the motion for an appeal, which the appellant made as heir at law and next of kin, to the Superior Court of Fairfield county. He also alleged that he was an elector and citizen of the State of Connecticut, and that if the law were so that the real estate had escheated, then he appealed for himself and for all other citizens of the State, as aggrieved by the distribution made in disregard of the escheat; and also as one to whom the next General Assembly would grant such real estate, on account of his having been adopted, though informally, by the intestate, and promised the property by devise.

The distributees and appellees moved that the appeal be erased from the docket, because it did not appear that the appellant was a party aggrieved, and did appear that he was not such. This motion was granted by the Superior Court, and the appellant appealed.

*Allan W. Paige* and *George P. Carroll*, for the appellant.

I. Next of kin aliens cannot inherit real estate of intestate citizens ; nor can next of kin citizens inherit real estate of intestate citizens, if inheritance has to be traced through alien blood. And this is common law in the United States. *Levy* v. *McCarter*, 6 Peters, 102, 113, commenting on the great case of *Collingwood* v. *Pace*, 1 Ventris, 413 ; *McCreery* v. *Somerville*, 9 Wheat., 354 ; *Jackson* v. *Green*, 7 Wend., 333 ; *Jackson* v. *Fitsimons*, 10 id., 1 ; *Banks* v. *Walker*, 3 Barb. Ch., 438 ; *McGregor* v. *Comstock*, 3 N. Y., 408, citing *Grey's Case* and *Courtney's Case ; Luhrs* v. *Eimer*, 80 N. Y., 171 ; *Campbell* v. *Campbell*, 5 Jones Eq., 246 ; *Bartlett* v. *Morris*, 9 Porter, 266 ; *Smith* v. *Zaner*, 4 Ala., 99 ; *Starks* v. *Traynor*, 11 Humph., 292 ; *In re Francis Forgue* and *Francis Forgue, Jr.*, 14 Col. Rec. Conn., 309 (1774). These principles antedate the rise of feudalism and the Norman Conquest. *Crane* v. *Reeder*, 21 Mich., 73, citing Com. Dig. "Prerogative," D. 59 ; Co. Litt., 8*a*, and authorities cited in the margin ; 2 Bla. Com., *pp. 249 and 250.

In England the statute of 11 and 12 Wm. III., c. 6, altered the common law by enabling *natural born* subjects to take, though inheritance had to be traced through alien blood of persons deceased, in the same manner as though such persons deceased had been naturalized or natural born.

This statute was repealed in 1870 by a statute, which still recognized the distinction between natural born and naturalized citizens. Statute of 33 and 34 Vict., c. 14. The question then is : What is the common law of Connecticut ? Is this British statute passed in 1700 in force with us, or does the common law prevail ? "English statutes, passed *before the emigration of our ancestors here*, and applicable to our situation, and in amendment of the law, constitute a part of the common law of this country." *Patterson* v. *Winn*, 5 Peters, 233 ; 1 Kent's Commentaries, 473, and cases cited ; 1 Story on the Constitution, §§ 155–197 ; 3 Am. & Eng. Ency. Law, 347, 348 ; *Card* v. *Grinman*, 5 Conn., 164, 168 ; *Fitch* v. *Brainard*, 2 Day, 189 ; *State* v. *Danforth*, 3 Conn.,

112, 114 ; *Baldwin* v. *Walker*, 21 id., 181 ; *State* v. *Cummings*, 33 id., 260 ; *Flynn* v. *Morgan*, 55 id., 130.

Connecticut was pre-eminently the charter colony of America.   In no part of the British Empire was there such a high degree of self-government.   The laws passed by the General Court required no assent by the King to insure their validity.   1 Story on the Constitution, Secs. 171, 176, 181 ; Brief of Yorke and Talbot in *Winthrop* v. *Lechmere*, Mass. Hist. Coll., Sixth Series, Winthrop Papers, Part VI., p. 488 ; Mass. Hist. Soc. Proceedings, 1860–62, p. 168.

" The legislation of Connecticut, and of New Haven, when the Scriptures were not thought to impose a different rule, *was based on the common law of England*, so far as it was not inapplicable to the circumstances of an infant colony.   When they found it unsuited to their wants, they did not hesitate to treat it as obsolete, or to substitute a contrary rule by an express statute."   Preface, p. vi, to General Statutes of 1875.   See also Acts and Laws, Revision of 1715, p. 128, last line.   In 1669, Connecticut passed a law concerning the distribution of intestate estate.   It is significant, however, that the true nature of the act was concealed by its title.   4 Col. Rec. Conn., 306–311; Acts and Laws, Revision of 1715, pp. 61 and 62 ; 7 Col. Rec. Conn., 191; Mass. His. Soc. Proceedings, 1860–1862, p. 168.   And this in substance has remained on statute of distributions ever since.   Acts and Laws, Revision of 1750, p. 55; Revision of 1784, p. 55; Revision of 1796, p. 167 ; Revision of 1808, p. 267.   But on Feb. 15th, 1727–8, in the case of *Winthrop, Appellant*, v. *Lechmere*, by an order of the King in Council, the Connecticut statute was declared null and void as contrary to the laws of England, relative to primogeniture, and as not warranted by the charter.   7 Col. Rec. Conn., 191 and 571–579 ; Mass. His. Coll., Sixth Series, Vol. V., Winthrop Papers, Part VI., 440–509 ; Mass. Hist. Soc. Proceedings, 1860–1862, p. 169.   The decision emboldened an eldest son in Massachusetts to appeal from a decree of distribution in that Colony, despite the fact that her statute had been solemnly approved.   The appeal, on Feb. 15th, 1737, was dismissed.   *Phillips* v. *Savage*,

Mass. His. Soc. Proceedings, 1860–1862, pp. 64–80 and pp. 167–171; 1873–1875, pp. 101–103. Taking courage from this last decision, another appeal was carried up from Connecticut, and the decision in *Winthrop* v. *Lechmere* was reversed in 1745. *Clark* v. *Tousey*, 9 Col. Rec. Conn., 587–593. The decision in *Winthrop* v. *Lechmere* and *Clark* v. *Tousey*, settled that: 1. The principles of the common law were in force in Connecticut. 2. The Colony had power to pass laws of a domestic nature not inimicable to the prerogative of the King or the authority of Parliament. 3. The statutes of England were not obligatory on the Colony unless they were needful to uphold the prerogative of the King or the authority of Parliament.

In 1750, the General Assembly ordered the printing of all the acts passed by the Parliament of Great Britain which the crown officials had ordered the Colony to observe. The statutes are seven in number. It is needless to remark that the Statute of 11 and 12 Wm. III., c. 6, is not found there. 9 Col. Rec. Conn., 550, 551. Such being the known temper of the people of Connecticut during the whole Colonial period, and especially after the decision of *Winthrop* v. *Lechmere*, can it be conceived that they would adopt any British statute unless it was absolutely forced upon them? Johnson's Hist. of Conn., pp. 192–205, 285–305. In 1795, Judge Swift published his celebrated "System." In language which is similar to that of judges and text writers in other States, he lays it down that the common law, in so far as it is applicable, is in force in Connecticut: Swift's System, 40–57; 3 Wilson's Works, 208. And toward the close of the colonial period there were two cases, the latter of which especially shows that the General Court then knew and recognized the principle of the common law, that no one was capable of inheriting who traced inheritance from the intestate through alien blood. 14 Col. Rec. Conn., 94, 308, 309. *Strong's Case*, Kirby, 374, and *State* v. *Ward*, 43 Conn., 497, do not tend in the least to overturn our position. From the time of Ludlow's code, provision was made in reference to escheats. 1 Col. Rec. Conn., 525; Laws of Connecticut

of 1673, p. 23; Acts and Laws, Revision of 1715, pp. 32, 178 and 179; Revision of 1750, p. 51; Revision of 1784, p. 51. That the principles as to alienage are a part of our common law has been judicially assumed. *Evans's Appeal from Probate,* 51 Conn., 435, 439. General Statutes 1888, §§ 15–17, the earliest provisions of which were passed in 1848, (Revision of 1849, p. 455, § 6,) alter the common law as to alienage only to the extent that the language goes. Only to the extent that these provisions are by their language operative, do they remove the common law disability of inheritance. *Luhrs* v. *Eimer,* 80 N. Y., 171. General Statutes 1888, § 632, is, as its name designates, a statute of distribution. It furnishes a formula for ascertaining who are next of kin. But it presupposes that any person thus ascertained is capable of inheriting and can deduce title according to the principles of the common law. If such person is not capable by reason of alienage, either of himself or of some person through whom he traces inheritance from the intestate, or by reason of illegitimacy on the paternal side of himself or of some person through whom he traces inheritance from the intestate, or by reason of himself being a monster, then he cannot inherit. 1 Swift's Digest, *p. 157. If the statute were intended to confer capacity, then, in the case at bar, Hugh Sludden or Sloan, the alien brother, could inherit the whole estate.

In those States organized after the Revolution, it is held that statutes passed before the first emigration to this country in 1607 are a part of the common law, so far as they are applicable. *Carter* v. *Balfour's Adms.,* 10 Ala., 814, 829; *Horton* v. *Sledge,* 29 Ala., 478; *Lavalle* v. *Strobel,* 89 Ill., 370; *Swift* v. *Tousey,* 5 Ind., 196; *Fisher* v. *Deering,* 60 Ill., 114; *Gardner* v. *Cole,* 21 Iowa, 205; *Kansas Pac. R. R. Co.* v. *Nichols,* 9 Kan., 235, 252; *Lathrop* v. *Commercial Bk.,* 8 Dana (Ky.), 114, 121; *Matter of Lamphear,* 61 Mich., 108; *Lorman* v. *Lansing,* 8 id., 25. But those statutes passed after the emigration and before 1776, are not a part of the common law. *Murroy* v. *Kelly,* 27 Ind., 42; *Smith* v. *Zanes,* 4 Ala., 99; *Bartlett* v. *Morris,* 9 Porter, 266; *Matthews* v.

*Ansley*, 31 Ala., 20 ; *Stemple* v. *Herminghauser*, 3 G. Green (Iowa), 408 ; *Starks* v. *Traynor*, 11 Humph. (Tenn.), 292 ; *Le Barron* v. *Le Barron*, 35 Vt., 365. If then, by the common law, persons tracing relationship to the intestate through alien blood, could not inherit, this court should not, at this late day, alter this law by adopting any English statute. *Card* v. *Grinman*, 5 Conn., 168 ; *State* v. *Parker*, 1 D. Chip. (Vt.), 298. The legislature has power to distribute this property in a paternal manner to the parties in proper proportions. *Wheeler's Appeal from Probate*, 45 Conn., 306 ; *Evans's Appeal from Probate*, 51 id., 435 ; *In re Bretzfelder*, 10 Private Laws, p. 47. The courts of this country are bound to enforce all the clearly established principles of the common law not repealed by statute. *Powell* v. *Brandon*, 24 Miss. 343 ; *Goodrich* v. *Lambert*, 10 Conn., 448, 451 ; 3 Am. & Eng. Ency. Law, p. 348. This court has recently ascertained and upheld principles of the common law, though they were contrary to our early colonial practice. *Flynn* v. *Morgan*, 55 Conn., pp. 132, 133, 140 and 141. So, too, where the principle seemed to be inequitable and had been altered by a statute which, however, could not be construed retrospectively. *Goodsell's Appeal from Probate*, 55 Conn., 171.

II. But if the statute of 11 and 12, William III., chap. 6, is in force, then the appellant, James Campbell and Mary E. Muldowney, as the next of kin *natural born* relatives of the intestate, take all the real estate. The appellees who claim to be heirs at law, are John Mines, a naturalized citizen, and four women who as wives of naturalized citizens are in the same category. *U. S. Rev. Stat.*, Sec. 1994 ; *Kelly* v. *Owen*, 7 Wall., 496. By Art. 1, § 8, of the Federal Constitution, Congress is given power " to establish an Uniform Rule of Naturalization." But there is no constitutional or statutory provision defining what *the effect* of naturalization shall be. The only requisite is that the qualifications for naturalization and the methods of naturalization shall be the same in every State. Undoubtedly as a general rule a naturalized citizen has the same rights as a native born citizen. But there is nothing to prevent a discrimination. In England

naturalization was effected by special acts of Parliament, in most of which there were discriminations. *Rex* v. *Mierre*, 5 Burr, 2787 ; 1 Bla. Com. (Sharswood's Ed.), p. 374 and notes; *Collingwood* v. *Pace*, 1 Vent., 420, and 1 Sid. 197 ; Stats. 12 and 13, Wm. III., c. 2. The same is true of the colonial days of Connecticut. *In re Sistera*, 14 Col. Rec. Conn., 94 ; *In re Forgue*, 14 Col. Rec. Conn., 308. Now if the statute of 11 and 12 Wm. III., c. 6, is adopted as a part of our law, it must be taken as it is and having such force and effect as its language imports. That is to say only *natural born* subjects can avail themselves of this exception to the common law rule. *M' Creevy* v. *Somerville*, 9 Wheat., 354 ; *McKinney* v. *Savigo*, 18 How., 235 ; *The People* v. *Irwin*, 21 Wend., 128 ; *McLean* v. *Swanton*, 13 N. Y., 535 ; *Banks* v. *Walker*, 3 Barb., Ch. 438. There is nothing in the Fourteenth Amendment to the Constitution that militates against this view. In the first place, by the familiar rule, that amendment is to be construed prospectively. Then there is no discrimination against the appellees as citizens of another State, but only as naturalized citizens. The discrimination would be the same if they were citizens of Connecticut. Finally, the word citizenship does not of itself include the element of descent or inheritance. 16 Albany Law Journal, 24, 176 ; 25 Am. Law Register, 1–14.

III. If the property has escheated then the appellant had the right to appeal as a citizen of this State.

*Stiles Judson, Jr.*, for the appellees, other than Susan Hensen.

I. In every appeal from probate the interest of the appellant must be stated in the motion for appeal, unless such interest appears on the face of the proceedings and records of the probate court. General Statutes, § 644 ; *Swan* v. *Wheeler*, 4 Day, 140 ; *Saunders* v. *Dennison*, 20 Conn., 554 ; *The Wardens etc.* v. *Hall*, 22 id., 130 ; *Deming's Appeal*, 34 id., 203 ; *Norton's Appeal*, 46 id., 528 ; *Taylor* v. *Gillette*, 52 id., 217 ; *Dickerson's Appeal*, 55 id., 229 ; *Buckingham's Appeal*, 57 id., 545.

II. If, however, all this estate has escheated to the State, it will not aid the appellant. He must stand or fall on his own pecuniary interest in the subject-matter of the decree. If his argument relative to escheat is sound, it certainly demonstrates his own lack of pecuniary interest, and fully justifies the action of the Superior Court in erasing the case from the docket.

III. The claim of the appellant that our forefathers brought with them to this country the entire body of the English common law, and hence must have adopted the principle that the blood of an alien ancestor would impede the descent of title to land traced through such alien, is not a sound one. For a period of 250 years, intestate estates in Connecticut have been distributed by force of our own laws concerning the distribution of intestate estates, and the English common law on the subject of descent of land within the colony, was never recognized in any of its peculiar phases; and though the Colonial Records disclose the fact that controversies arose upon this subject, neither the courts, nor the General Assembly ever departed from the principle that the statute of distribution as adopted by the General Court must govern exclusively in the distribution of estates. In the Revision of 1672, it will be found that intestate estates were to be divided between the widow and children or kindred of the intestate according to law, " and for want of law according to the rules of righteousness and equity." In 1699, a statute of distributions substantially like the present statute was adopted by the General Court; it was provided however in said act that the eldest son should receive a double portion of the estate. This provision was not derived from any principle of the common law but rather from the law of Moses, for which the colonists had much greater love and veneration than any principle pertaining to the English laws of property. It is made apparent by a glance at the legislative proceedings of the colony, that the laws of England never dominated their actions to any considerable degree. Colonial Records, Vol. 4, p. 261; Journal of Lower House, May 16th, 1716.

At a county court held at New London, Sept. 20th, 1698, in the case of *Edward Palmes et al.* v. *Fitz John Winthrop et al.*, the following entry was made on the docket: "It is agreed by plaintiff and defendant that the laws of England shall be pleaded and made use of in this case and it is allowed of by this court." The case by appeal came before the Court of Assistants when it was said by Nathaniel Foot, Esq., attorney: "That the Court of New London had not power to allow what they there entered * * * their commissions and jury's oath obliging them to the attendance and observation of the laws of Connecticut Colony." *Winthrop's Appeal*, Colonial Records, Vol. 7, p. 191; *Tousey* v. *Clark*, id., Vol. 9, p. 550. The theory upon which estates descend under our system of jurisprudence, presents no such condition as would admit of the application of the common law disability of tracing the title through alien blood. It was the fiction of the common law that the title traversed through all the intermediate ancestors who intervened between the intestate and the claimant, and for reasons of feudal origin, the title, in its descent, was obstructed by meeting with alien blood. Such is not the theory of descents in this State nor in any other State except where the common law of England has been adopted *in toto* by statute. Appellees do not trace title through their deceased alien ancestor, but their pedigree is resorted to solely to establish the degree of relationship between them and the intestate; the title flows directly to them from the intestate by force of the statute itself, and their rights are to be determined by reference solely to our own rules of descent. *Brown* v. *Dye*, 2 Root, 285; *Fitch* v. *Brainerd*, 2 Day, 189; *Hillhouse* v. *Chester*, 3 id., 213; *Heath* v. *White*, 5 Conn., 233; *State* v. *Danforth*, 3 id., 118; *Baldwin* v. *Walker*, 21 id., 180; *Dickinson's Appeal*, 42 id., 502.

The cases from New York State cited by the appellant have absolutely no application. By force of their Constitution and the Act of 1786, they had the common law respecting descent of estates in all its original state, and with all its attending drawbacks and absurdities.

Later they removed the bar of alienage in an ancestor by

Act of 1832, and by the Act of 1845, and by subsequent enactments the rigors of the common law respecting aliens became eliminated.

IV. Even were the appellant to demonstrate that the common law disability referred to became a part of our laws of descent, he will have gained nothing by the demonstration; for the bar was removed in respect to native born subjects of the realm by the Act of 11 and 12 of William III., and if the original disability was ever lurking unknown in our laws of descent, the Act of Parliament referred to would also become a part of our jurisprudence; for it was adopted by Parliament before the Declaration of Independence, and Acts of Parliament in amelioration of the common law passed prior to 1776, while having no force as statutes or positive rules of law, had their effect in determining the decision of the court, if applicable to our conditions. *State* v. *Ward*, 43 Conn., 492; *McCreery's Lessees* v. *Somerville*, 9 Wheat., 354; *Palmer* v. *Edwards*, 2 Mass., 179; *Haigh* v. *Haigh*, 9 R. I., 30. If effect, then, is given to the Act of Wm. III., whereby the descent would be no longer impeded, in the case of a native born citizen the same condition of amelioration of the hardship of the common law must, under the mandates of the Constitution of the United States, be fully accorded to naturalized citizens, and upon this line of reasoning the appellees still remain the rightful heirs at law of the intestate in respect to the real estate in controversy. "Naturalization gives an alien all the rights of a natural born citizen; he thereby becomes capable of receiving property by descent and of transmitting it in the same way." *Jackson* v. *Green*, 7 Wend., 333; *Crane* v. *Reeder*, 21 Mich., 65; 1 Bla. Com., 374; Cooley's Blackstone, Vol. 1, top page 376, note; *Anislee* v. *Martin*, 9 Mass., 454; Vol. 3, Am. & Eng. Ency. of Law, p. 248 (note); 2 Kent Com., 65, 66, 69, 71; *Osborn* v. *Banks*, 9 Wheat., 825; *Jackson* v. *Green*, 7 Wend., 339; Vol. 3, Am. & Eng. Ency. of Law, p. 253; Colonial Records, Vol. 14, p. 309; Revision, Statutes 1784, p. 239; Revision, Statutes 1838, p. 287.

The appellant, as a native born citizen of this country,

can be afforded no rights of property that cannot equally be claimed by the appellees, as naturalized citizens of this country; and as the latter are one degree nearer in relationship to the intestate, and as no representatives are to be admitted among collaterals after representatives of brothers and sisters, the appellant is not the next of kin to the intestate; and therefore has no *pecuniary interest* in the subjectmatter of the decree of the probate court, and his appeal was properly dismissed by the Superior Court.

*George G. Sill* filed a brief for the appellee, Susan Hensen.

BALDWIN, J.   The appellant claims to be aggrieved by the probate decree of distribution, as an heir at law and next of kin to the intestate, and also as a citizen of the State, acting for himself and all the rest of its citizens.   His contention is that either the real estate in question escheated to the State, in which case he, as one of its citizens, has an interest in defeating a distribution to private individuals; or else that an escheat, so far as he is concerned, has been prevented by force of the statute of 11 and 12 Wm. III., Chap. 6, in favor of inheritances by natural born citizens.

It was a rule of the common law of England that "on failure of lineal descendants or issue of the person last seised, the inheritance shall descend to his collateral relations, being of the blood of the first purchaser."   2 Blackst. Comm., 220.   The requirement that the heir musts be of the blood, that is, descended from the first purchaser, was something peculiar to the feudal system.   It rested on the principle that feuds were granted for personal service and personal merit, and that like service and like merit, on the part of the successors in estate of the feudatory, would be best assured by admitting to that number only those who derived their natural characteristics from him by descent.   A legal fiction was next invented, by which, failing direct descendants of the person last seised, his collateral heirs were deemed to be of the blood of the first purchaser; that position being arbitrarily assigned to the common ancestor, whether in fact he

ever owned the land or not. In order to establish their title, however, it was necessary to trace their descent back to him, in each degree, through "inheritable blood." If, therefore, any intermediate ancestor was an alien, as he could have no heirs, so he could have no inheritable blood, and the land escheated.

It is this regard paid by the common law to the original purchaser of the estate, real or fictitious, that led it to reckon degrees of consanguinity in accordance with the canon law, by simply going back to the common ancestor, without then proceeding, as by the civil law, to compute the degrees between him and the intestate.

The real estate tenures of a country are necessarily an important feature of its political system. The institution of feudalism and primogeniture were obviously unsuited to the conditions under which New England was first settled, and her people looked more to the civil than to the common law to guide their policy as to the distribution of landed estates. 2 Washburn on Real Property, 404, 408.

In October, 1639, the General Court of Connecticut, upon the report of a committee, which had been appointed "to ripen some orders that were left unfinished the former Court," as to the "settling of lands, testaments of the deceased," and other matters, enacted that intestate estates should be divided by the Public (or Particular) Court between the wife, children, or kindred, "as in equity they shall see meet;" and if no kindred be found, the court "to administer for the public good of the Commonwealth." 1 Colonial Records of Conn., 38; Ludlow's Code, id., 553. In the Revision of 1673 (Ed. of 1865, p. 36) the provision is that such estates be divided between the wife, and children or kindred "according to Law, and for want of Law, according to rules of Righteousness and Equity; And if no Kindred be found, the Court to Administer for the publick good of the Colony." At the close of the century, in 1699, a statute of distributions was passed, copied mainly from that adopted several years before in Massachusetts. It put all the children of an intestate on a footing of equality, except

that the eldest son was to have a double portion.   Statutes,
Revision of 1702, Ed. of 1715, p. 61.   In 1713, it was fur-
ther provided that male heirs should have their shares set
out in real estate, so far as this was practicable.   Ibid., p. 192.
In 1727, (Session Laws, p. 110,) it was enacted that real es-
tate which came to the intestate by descent, should be dis-
tributed among his kindred of the blood of the purchasing
ancestor, without distinction between those of the whole
blood and those of the half blood, nor should any such dis-
tinction be made as to real estate which came to the intestate
by purchase; and also that " the next degree of kindred in
the Line Transverse shall be admitted to the Inheritance be-
fore the next degree of Kindred in the Line Ascendant; and
the next degree of Kindred in the Line Ascendant shall be
admitted to the Inheritance before a Remoter degree in the
Line Transverse."   This statute was omitted in the Revision
of 1750.

This course of legislation plainly set up for the Colony of
Connecticut rules of inheritance differing fundamentally
from those of the common law of England.   For that cause,
our statute of distribution was pronounced null and void by
the King in Council, in the well-known case of *Winthrop* v.
*Lechmere*, in 1727–8.   7 Colonial Records of Conn., 191,
571–9.   That judgment was, however, practically disregard-
ed in the Colony; and the statute was finally sustained, as a
legitimate exercise of chartered rights, by the same tribunal,
in 1745, in the case of *Clark* v. *Towsey*, 9 Colonial Records
of Conn., 587–593.

This had been the uniform doctrine of our own courts.
" The *English* law of descents has never been admitted in
this State."   *Heath* v. *White*, 5 Conn., 228, 233.   The com-
mon law maxim, *seisina facit stipitem*, was never accepted
here.   *Hillhouse* v. *Chester*, 3 Day, 166, 211; *Bush* v. *Brad-
ley*, 4 id., 298, 305.   The computation of degrees of relation-
ship between an intestate and his heirs has always been made
according to the rule of the civil law.   *Hillhouse* v. *Chester*,
*supra*.   Bastards have been allowed to inherit through their
mothers, without regard to the common law doctrine as to

their defect of "inheritable blood." *Brown* v. *Dye*, 2 Root, 280; *Heath* v. *White, supra; Dickinson's Appeal*, 42 Conn., 491.

The only indication, either in our legislative or judicial records, of the recognition in this Colony of the common law doctrine that no title to an inheritance could be traced through alien blood, which has been brought to our attention by the researches of counsel, is that contained in a private act passed by the General Assembly in 1774. By this statute, entitled "An Act for the Naturalization of Francis Forgue, for confirming the Purchase of Real Estate by him made and rendering his Issue capable of inheriting," a grant of naturalization was made to Francis Forgue, a Frenchman, who had purchased lands in the Colony and resided in Fairfield; his title to these lands was confirmed; and it was declared that his son, Francis Forgue, Jr., was and should be "as capable of inheriting and taking by descent or purchase all and any real estate or estates whatsoever as he might, could, or would have been, had the said Francis, the elder, been compleatly naturalized as aforesaid before the birth of the said Francis, the younger." 14 Colonial Records of Conn., 308–9. It is, doubtless, true that this express provision in favor of the son was made in order to assure or confirm his title, should he survive his father and become his heir, to the lands acquired by the latter while still a subject of France, as well as to any which he might subsequently purchase; and it is probable that it was inserted in view of the rule of common law that naturalization by Act of Parliament enables the son of the alien so naturalized to inherit from him, though born before the passage of the Act. Such was not the case, if the alien had only been made a denizen, by letters patent from the crown (Co. Litt., 129), and the draftsman of our statute could hardly have felt safe in assuming that greater effect, even in our own courts, would be given to a colonial than to a royal grant, unless it was plainly required in express terms. So late as 1795 it was an unsettled question in this State whether a conveyance of land to an alien might not

be an absolute nullity.  1 Swift's System, 166 ; Statutes, Ed. 1784, p. 83 ; Session Laws of 1777, p. 476.

It is therefore our opinion that the common law rule of the exclusion from inheritance of all tracing their descent through uninheritable blood was never in force in Connecticut, and that there was no error in the decree of distribution to the first cousins of Patrick Sloan, notwithstanding their relationship to him through alien ancestors.

Another first cousin was the mother of the appellant ; but as she died before the intestate, and there is no representation among cousins under our statute of distribution, the appellant had no right to share in the inheritance, as one of the next of kin ; nor has the State (if he could make claim in its behalf) any interest in the lands, since there has been no escheat.

The extent of whatever interest the appellant could claim in the estate appeared on the face of his appeal to the Superior Court.  He could appeal only if " aggrieved " by the decree ; and as he was neither next of kin, nor heir at law, nor representative of any party in interest, the cause was properly erased from the docket.  His allegation that he is " aggrieved both as an heir at law and next of kin," is a mere averment of a legal conclusion from the facts previously set up, and these show that it is wholly without foundation.

The appellant claims that as, if his mother had been first purchaser of the land in controversy, he could have claimed it as ancestral real estate, under General Statutes, § 632, the motion to erase should have been denied.  But had he such a claim to make, he was bound to set out the facts upon which it arose.  In the absence of such allegations, and in the face of others showing that he is not the next of kin, the bare statement that he is the heir at law could not avail to defeat the motion to erase.  *Norton's Appeal*, 46 Conn., 527.

There is no error in the judgment appealed from.

In this opinion the other judges concurred.