**263 P.2d 537**

**GRAHAM COUNTY v. BUHL.**

**No. 5771.**

Supreme Court of Arizona.

Nov. 9, 1953.

Ruskin Lines, County Atty., Safford, for appellant.

Max T. Layton, Safford, for appellee.

UDALL, Justice.

E. R. McBride, Sheriff of Graham County, on January 1, 1953 appointed his cousin, J. W. Buhl, a deputy-sheriff at a salary of $300 per month. The latter demanded his salary but the Board of Supervisors of Graham County, acting under the advice of their county attorney, refused to pay it on the ground the appointment was in violation of our nepotism law. Buhl, as plaintiff, then brought suit against Graham County to recover his salary. After trial, judgment for plaintiff was entered and defendant appeals. We shall hereafter refer to appellant as defendant and to appellee as plaintiff.

Section 56–105, A.C.A.1939 makes the employment of relatives within certain degrees unlawful. Insofar as applicable, this section reads as follows:

"It shall be unlawful for any executive * * * officer to appoint * * * any person related to him by affinity or consanguinity *within the third degree,* to any * * * employment * * * in any department of the * * * county * * * of which such executive * * * officer is a member, when the salary * * * of such appointee is to be paid out of the public funds * * *." (Emphasis supplied.)

A violation of this statute is made a misdemeanor.

It is admitted that the sheriff and plaintiff are related by consanguinity and are first cousins, having common grandparents.

Defendant's sole assignment of error is that the trial court used the wrong yardstick in determining the degree of relationship. Its contention is that the common law or canon law, rather than the civil law method of computing degrees of consanguinity should be applied in interpreting Section 56–105, supra. An examination of our various statutes dealing with relationships will disclose that in some instances the legislature specifically designated the prohibited relationships, but in none of them has the legislature said which of the two rules is to be followed. See, Section 39–101 et seq., A.C.A.1939, descent and distribution; Section 41–108 dealing with children as "descendants of every degree"; Section 38–401, Administrators—order of preference; Sections 37–103 and 44–1313, disqualification of jurors "within the fourth degree"; Section 21–107, change of judge where he "is of kin or related to either party"; Section 63–107, persons who may intermarry; and Section 54–416(3), school trustees prohibited from employing relatives within the second degree.

The whole basis of defendant's contention is that inasmuch as the legislature in adopting the anti-nepotism law, Section 56–105, supra, did not spell out the method to be followed in computing degrees of relationship, the common law governs. It relies upon Section 1–106, A.C.A.1939, which provides:

"The common law, so far only as it is consistent with, and adapted to the

natural and physical conditions of this state, and the necessities of the people thereof, and not repugnant to, or inconsistent with * * * established customs of the people of this state, is hereby adopted and shall be the rule of decision in all courts of this state."

If the canon law method of computing degrees is followed, the trial court was in error, for the sheriff and his deputy would come within the second degree, as in applying this rule you begin with the common ancestor and reckon downwards, and in whatever degree the two persons, or the most remote of them, is distant from the common ancestor, that is the degree within which they are related to each other. Whereas, under the civil law rule as applied to the instant case, we begin with plaintiff and trace upwards to the common ancestor and then trace downwards to the sheriff. If this method of computation is the correct one, the parties are related within the fourth degree, hence the appointment would be valid and the judgment of the lower court correct. See 4 Kent's Comm. (star page) 412, Fourteenth Ed. page 473. For explanation and diagram of both rules, see Cooley's Blackstone, Book II, Chapter XIV, (star page) 200, or Bouvier's Law Dictionary, Rawles Third Revision, Consanguinity.

Plaintiff primarily relies upon the case of Barton v. Alexander, 27 Idaho 286, 148 P. 471, Ann.Cas.1917D, 729. In this opinion the Idaho court was among the first to uphold the constitutionality of an anti-nepotism Act enacted under the police power of the state for the purpose of improving the efficiency of public service and discouraging the practice of making appointments upon considerations other than the merit or ability of the appointees. See also Annotation 88 A.L.R. 1103. However, the validity of our Act is not questioned on this appeal, and the Barton case, supra, is of no help in determining whether to apply the civil or canonical rule, because the Idaho statute expressly provides degrees of kindred are to be computed *according to the rules of the civil law.*

The Supreme Court of Ohio, in Clayton v. Drake, 17 Ohio St. 367, 368, faced the problem of whether the canon law or the civil law method of computing degrees of consanguinity was to be followed, and said:

"And here the first question made by counsel for plaintiffs, is as to the proper mode of ascertaining who are "the next of kin," within the meaning of the statute. There are two modes of computing the degrees of kindred; one, according to the *canon* law, and the other, by the rules of the *civil* law. On the subject of descents, the common law of England adopts the former mode of computation, which the plaintiffs claim is to be followed in this state. But we think it clearly otherwise; and that the rule of the civil law is the common law of this country in the

computation of degrees of kindred. This is believed to be universally the case in all the states of the Union, except, perhaps, in North Carolina, where the common-law rule prevails, generally, and in New York with respect to the more remote relations. 4 Kent, 412; Walker's Am.Law, 346, 348; 2 Hilliard on Real Prop. 202, § 63.

"The common-law rules, or canons of descent in England, grew out of the feudal system of tenures, and a state policy designed to perpetuate that system; and both are foreign to the spirit of republican institutions. The common-law mode of computing kindred was an important element in that policy, which, being wholly unsuited to our circumstances, our habits of thought, and political institutions, has never been regarded as the law of this state. As to personal property, even in England, their statutes of distribution are governed and construed by the rules of the civil law; and the next of kin is determined by the rule which it furnishes. 2 Kent's Com. 422; T.Raym. 496; 2 Ves.Sr. 214; 2 Bla.Com. (Kerr's) 504."

Likewise, in McDowell v. Addams, 45 Pa. 430, we find:

" * * * There are two methods of computing the degrees of consanguinity, one by the canon law, which has been adopted into the *common law of descents* in England, and the other

by the civil law, which is followed both there and here in determining who is entitled as next of kin to administer the personalty of a decedent. * * *" (Emphasis supplied)

\* \* \* \* \* \*

" * * * The rule of the common law, then, is limited, even in England, to the descent of real estate, and is retained, as to that, for reasons that grew out of their feudal tenures. * * *"

The Supreme Court of Oregon, in Smallman v. Powell, 18 Or. 367, 23 P. 249, 250, found the canon law rule was adopted to fit the needs of a feudal society:

" * * * At common law the canons of descent grew out of the feudal system of tenures, and the policy of the state to establish and maintain a wealthy landed aristocracy, which co-operated to prevent the distribution of real property, and to promote its accumulation in the hands of the few. An important factor in working out this result was the common-law mode of computing kindred, which, being alien in spirit to our political institutions has been generally rejected, and in this state abrogated, and the rules of the civil law adopted. * * *"

For a more scholarly analysis of the historical causes which prompted the English courts to adopt the canonical computation of degrees of consanguinity to deter-

mine heirship to realty, see Appeal of Campbell, 64 Conn. 277, 29 A. 494, 24 L.R. A. 667.

In Bailey v. Turner, 108 Kan. 856, 197 P. 214, 215, the court dealt with a nepotism statute which provided, "* * * no reporter shall be related by blood to the presiding judge of the court wherein he is employed." Laws 1921, c. 171, § 1. In deciding where the line was to be drawn as to the prohibited degrees of relationship, the court adopted the common law rule for disqualification of jurors, and pointed out,

"* * * The accepted view, however, is that at the common law the juror was disqualified only by relationship within the ninth degree; the computation being made according to the civil as distinguished from the canon law. * * *"

▮ From the cases cited it is apparent that the common law adopted the canon law rule for one purpose and the civil law rule for another. The one rule is no less a part of the common law than the other. Therefore, the real problem here presented is, which of the two common law rules applies? Certainly the social and political reasons which prompted feudal England to formulate the old canons of descent and adopt the canonical law rule to implement them, have never held sway in Arizona. The rule was tailored to the needs of a vanished society, one having many concepts foreign to ours. The reason for the rule has gone, and the rule has gone with it. The civil law method is easier to apply, less confusing, and may even be said to rest upon a sounder basis in logic. Moreover, the members of this court as presently constituted, having all served as judges of the superior court, take judicial notice of the fact that it has been the common practice of the bench and bar of this state to apply the civil law method rather than the archaic and cumbersome canonical rule in determining degrees of relationship, such as disqualification of jurors, etc. It appears from the decisions of the Attorney General that on May 4, 1934,—when Mr. Justice LaPrade held that office—the public officers of this state were advised to apply the civil rule in computing degrees of relationship in nepotism cases.

▮ We hold the civil rule is the one the legislature intended in enacting our anti-nepotism law.

Judgment affirmed.

STANFORD, C. J., and PHELPS, LA PRADE and WINDES, JJ., concur.